**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**
**CINCINNATI, OH**

| | |
|---|---|
| **Ohio Justice and Policy Center,** )<br>*A Nonprofit Law Firm,* )<br>215 E 9th St. Suite 601 )<br>Cincinnati, OH 45202 )<br> )<br> )<br>***Plaintiff,*** )<br> )<br>**vs.** )<br> )<br>**Annette Chambers Smith,** )<br>*In her official capacity as Director of the* )<br>*Ohio Department of Rehabilitation and* )<br>*Correction,* )<br>1800 Harmon Ave., )<br>Columbus, OH 43228 )<br> )<br>**Cynthia Davis,** )<br>*In her official capacity as Warden of* )<br>*Southern Ohio Correctional Institution,* )<br>1724 St. Rt. 728 )<br>Lucasville, OH 45699 )<br> )<br>**George A. Fredrick,** )<br>*In his official capacity as Warden of Marion* )<br>*Correctional Institution,* )<br>940 Marion-Williamsport Rd E )<br>Marion, OH 43302 )<br> )<br>**Doug Luneke,** )<br>*In his official capacity as Warden of Lebanon* )<br>*Correctional Institution,* )<br>3791 State Route 63 )<br>Lebanon, OH 45036 )<br> )<br>**Bill Cool,** )<br>*In his official capacity as Warden of Ross* )<br>*Correctional Institution,* )<br>16197 State Route 104 )<br>Chillicothe, OH 45601 )<br> )<br> )<br> ) | Case No: 1:25-cv-291-DRC<br><br>Judge: Douglas R. Cole<br><br>Magistrate Judge:<br><br><br>**VERIFIED AMENDED AND**<br>**SUPPLEMENTAL COMPLAINT FOR**<br>**DECLATORY AND INJUNCTIVE RELIEF** |



**Ryan Walters,**
*In his official capacity as Warden of Allen-*
*Oakwood Correctional Institution,*
2338 North West Street
Lima, OH 45801

**Tim Shoop,**
*In his official capacity as Warden of*
*Chillicothe Correctional Institution,*
15802 OH-104
Chillicothe, OH 45601

**Malcom Heard,**
*In his official capacity as Warden of Franklin*
*Medical Center,*
1990 Harmon Ave,
Columbus, OH 43223

**Aaron Mohr,**
*In his official capacity as Warden of London*
*Correctional Institution,*
1580 State Route 56 SW
London, OH 43140

**Jenny Hildebrand,**
*In her official capacity as Warden of Madison*
*Correctional Institution,*
1851 State Route 56
London, OH 43140

**Erin Maldonado,**
*In her official capacity as Warden of Ohio*
*Reformatory for Women,*
1479 Collins Ave
Marysville, OH 43040

**Michael Swartz,**
*In his official capacity as Warden of Toledo*
*Correctional Institution,*
2001 E Central Ave
Toledo, OH 43608

***Defendants.***

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## I.      PRELIMINARY STATEMENT

1. This is a civil rights case challenging the recently implemented, unconstitutional variance to the Ohio Department of Rehabilitation and Correction's (ODRC) Legal Mail Policy (75-MAL-03 §VI.A.4-5) (hereinafter "Legal Mail Policy Variance"). The challenged Legal Mail Policy Variance allows for the close inspection, photocopying, and therefore, reading of confidential legal mail:

> 3.      If the legal mail does not appear suspicious, or does not need further investigation, a designated staff member will proceed as follows:
>
>      i. The staff member will copy the document in the presence of the Incarcerated Person using the designated legal mail copier with no memory capability and allow the Incarcerated Person to review the copy to ensure it contains the same number of pages as the original document.
>
>      ii. If the Incarcerated Person acknowledges that the copy contains the correct number of pages and is legible, the Incarcerated Person shall sign the Legal Mail Log (DRC2632) acknowledging that they were shown the original legal mail took possession of the copy. No additional copies will be made.
>
>      iii. Once the Incarcerated Person accepts the copy, the original document will be shredded in the presence of the Incarcerated Person using the designated legal mail shredding equipment.
>
>      iv. If the Incarcerated Person disputes that the copy matches the original, staff will check to see if an error was made, and if so, correct it.

The challenged policy is attached to this Complaint as Exhibit A.

2. The Legal Mail Policy Variance replaces a brief process of opening and inspecting legal mail with an extended process of copying and shredding that allows for many opportunities to read confidential legal mail. The Legal Mail Policy Variance requires extensive handling of paper to ensure it feeds into the copier correctly, to fix paper jams, to check for double or single-sided pages, looking at individual pages as they are being copied or shredded, fanning out pages, flipping through pages, and sometimes even looking at each individual page with the recipient of the mail as they compare the copies and the originals. Ex. B, Decl. of Susan Shellenberger, at ¶46.

3. The Legal Mail Policy Variance was implemented to further secure legal mail; however, ODRC's own data belies the conclusion that attorneys are responsible for the introduction of contraband into their facilities.

4. The right to communicate confidentially with attorneys is sacrosanct. It protects all other rights by allowing incarcerated individuals to seek advice and counsel when their civil rights are potentially being violated. By allowing for the close inspection and photocopying of confidential legal mail, which will naturally lead to the reading of at least parts of the legal mail, ODRC is continuously breaking the sacred trust OJPC's attorneys need to maintain with its clients to be effective and ethical advocates, and for OJPC's clients to feel comfortable communicating fully and frankly with their attorneys. *See Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981) (observing that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice"); "[E]ven in a jail, or perhaps particularly there, the

relationships which the law has endowed with particular confidentiality must continue to receive unceasing protection..." *Lazar v. New York,* 370 U.S. 139, 143-144 (1962).

5. Plaintiff brings this action to end this egregious breach of their rights to communicate in a confidential manner with their incarcerated clients and incarcerated potential clients, and to vindicate the rights of its incarcerated clients to communicate confidentially with attorneys.

## II.     JURISDICTION AND VENUE

6. This case arises out of 42 U.S.C. §1983, and the First and Fourteenth Amendments to the U.S. Constitution. This court has jurisdiction to hear this case pursuant to 28 U.S.C. §1331.

7. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial portion of the events giving rise to this litigation occurred within the Western Division of the Southern District of Ohio.

## III.     THE PARTIES

8. Plaintiff Ohio Justice and Policy Center ("OJPC") is a 501(c)(3) nonprofit law firm which provides free legal services to people who are incarcerated in Ohio's state prisons. OJPC sues to vindicate its rights as well as the rights of its attorneys, and its incarcerated clients.

9. Defendant Annette Chambers-Smith is the Director of the Ohio Department of Correction and Rehabilitation ("ODRC"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in her official capacity.

10. Defendant Cynthia Davis is the Warden of Southern Ohio Correctional Facility ("SOCF"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in her official capacity.

11. Defendant George Fredrick is the Warden of Marion Correctional Institution ("MCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

12. Defendant Doug Luneke is the Warden of Lebanon Correctional Institution ("LeCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

13. Defendant Bill Cool is the Warden of Ross Correctional Institution ("RCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

14. Defendant Ryan Walters is the Warden of Allen Oakwood Correctional Institution ("AOCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

15. Defendant Tim Shoop is the Warden of Chillicothe Correctional Institution ("CCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

16. Defendant Malcom Heard is the Warden of Franklin Medical Center ("FMC"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

17. Defendant Aaron Mohr is the Warden of London Correctional Institution ("LoCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

18. Defendant Jenny Hildebrand is the Warden of Madison Correctional Institution ("MaCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in her official capacity.

19. Defendant Erin Maldonado is the Warden of Ohio Reformatory for Women ("ORW"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in her official capacity.

20. Defendant Michael Swartz is the Warden of Toledo Correctional Institution ("ToCI"). Defendant is a "person" under 42 U.S. §1983. At all times relevant to this complaint, Defendant has acted and continues to act under color of law. Defendant is sued in his official capacity.

21. Defendants Davis, Frederick, Luneke, Cool, Walters, Shoop, Heard, Mohr, Hildebrand, Maldonado, and Swartz may be referred to hereinafter as "the Warden Defendants."

## IV.    FACTS

22. OJPC has been providing free legal services to indigent incarcerated people who reside in ODRC facilities, and others impacted by the criminal legal system since 1997.

23. OJPC is a small nonprofit law firm with limited staff and resources.

24. OJPC communicates with its clients primarily via confidential legal mail.

25. OJPC receives dozens of letters a month from currently incarcerated people seeking legal services.

26. OJPC responds to letters that discuss a potential legal matter that we may be able to assist with by sending a legal mail letter with intake forms requesting confidential information in contemplating legal representation. People who write to OJPC about the possibility of legal representation expect their information to be kept confidential.

27. Incarcerated individuals have limited communication channels available to them to contact their attorneys.

28. Many letters received by OJPC include sensitive, private information that incarcerated individuals would not want prison officials to become aware of. Many letters contain: 1) self-incriminating information; 2) specific allegations against specifically named corrections officers and prison staff; 3) medical and mental health information; or 4) allegations of sexual abuse. These are only some examples of the intimate information OJPC attorneys become aware of through their relationship with their clients and individuals seeking legal services. Prison officials becoming aware of such information may lead to retaliation, interference with their rights, and abuse.

29. Regardless of the subject matter, individuals seeking advice from attorneys must be assured complete confidentiality in order to be candid with their lawyers, which is a cornerstone of our legal system. Only through an assurance of confidentiality will a client

be able to communicate fully and frankly, even "as to embarrassing or legally damaging subject matter" with their attorney, which is required to undertake an effective attorney-client relationship. *See* Ohio Prof. Cond. R. 1.6, Comment [2].

30. OJPC's attorneys are subject to the Ohio Rules of Professional Conduct.

31. The Ohio Rules of Professional Conduct impose a duty on attorneys to keep information learned in the course of legal representation confidential, and to keep information learned in the course of contemplation of legal representation confidential. Ohio Prof. Cond.R. 1.6; 1.18(b).

32. As of December 2, 2024, the Legal Mail Policy Variance was implemented at SOCF, MCI, and LeCI. On April 1, 2024, Defendant Chambers-Smith added RCI to the list of institutions subject to the Legal Mail Policy Variance. Exhibit A-2, Ross Legal Mail Policy Variance.

33. Plaintiff initially filed suit on May 6, 2025.

34. After Plaintiff filed its initial complaint against Defendants Chambers-Smith, Davis, Luneke, Fredrick, and Cool, Defendant Chambers-Smith re-affirmed her approval of the challenged Legal Mail Policy Variance, and extended its reach to seven new institutions: AOCI, CCI, FMC, LoCI, MaCI, ORW, and ToCI. See Exhibit A, Legal Mail Policy Variance.

35. The June 1, 2025 version of the Legal Mail Policy Variance is identical in substance to the previous versions.

36. The implementation of the Legal Mail Policy Variance has caused prison officials to read confidential legal mail as a natural result of the extensive handling of legal mail that they

are required to do in order to copy the legal mail, ensure the legal mail is copied correctly, and shred the originals. *See generally* Decl. of Susan Shellenberger, Ex. B.

37. OJPC has confirmed at least one incident where a prison official has read confidential legal mail since the Legal Mail Policy Variance has been in effect. On December 10, 2024, eight days after the Legal Mail Policy Variance took effect, Plaintiff received a voicemail from Oscar Smith, a staff member at MCI. The voicemail includes him reading aloud a section of confidential legal mail addressed to a client residing at MCI, incorrectly asserting that the piece of mail was a "newsletter" instead of a message of hope for the holiday season that OJPC sent to its currently incarcerated clients to lift their spirits. Ex. C, Declaration of Chloe Kilguss. Helping clients stay positive and remain hopeful is an important component of the attorney-client relationship, particularly when a client is incarcerated.

38. In January 2025, after the Legal Mail Policy Variance was implemented, OJPC sent confidential legal mail to Mr. Dennis Pointer, a person seeking legal assistance from OJPC, who resides at LeCI. Ex. D, Declaration of Dennis Pointer.

39. On January 3, 2025, Mr. Pointer arrived at the mailroom and found that his mail was already opened and copied. It was clear that the mail was already copied because mailroom staff took paper out of a copier, then handed it to him. The opening and copying did not take place in his presence. He did not witness the original being shredded. *Id.*

40. In February 2025, Mr. Pointer again received legal mail from OJPC. Again, the mail was not opened in his presence. LeCI mailroom staff copied the mail while he was signing for the mail. He did not see whether the original was shredded. *Id.*

41. While LeCI staff's actions related to Mr. Pointer's mail violated the letter of the Legal Mail Policy Variance, this incident shows that it is vulnerable to abuse and easily creates situations where prison staff can violate the rights of OJPC and OJPC's clients, and damage the ability of OJPC attorneys to communicate with potential clients in the initial stages of a legal matter.

42. During the COVID-19 pandemic, ODRC would facilitate confidential video calls between incarcerated people and their attorneys; however, ODRC has limited this program to "urgent situations," subject to institutional discretion. Ex. E, "Information for Attorneys" 2021 Letter.

43.  To communicate with their attorneys, incarcerated people must rely on legal mail, email/messaging through a paid app, phone calls, and legal visits.

44. Phone calls and messaging through the Getting Out/Global Tel Link app are not confidential.

45. There is a "whitelisting" method to prevent calls from incarcerated people to their attorneys from being recorded. However, "whitelisted" calls do not guarantee confidentiality because incarcerated individuals are not afforded private rooms to make these phone calls. Therefore, an incarcerated person's cellmate or other persons, both incarcerated people and prison staff members in earshot may be able to hear parts of the conversation.

46. Even if truly private phone calls were easily obtainable, the mail is indispensable because for OJPC to commence legal representation, the client must sign a written representation agreement and releases of information.

47. In the course of representation, OJPC may send additional documents or send follow-up information via letter.

48. Essentially, attorneys who represent incarcerated individuals who live at ODRC facilities must communicate with their clients via legal mail or in-person visit.

49. Since the Legal Mail Policy Variance has been implemented, OJPC has sent mail to SOCF, LeCI, MCI, and RCI.

50. OJPC attorneys, as of the date of the filing of this supplemental complaint, have yet to send confidential legal mail into the seven newly affected institutions. OJPC has sent confidential legal mail to each of the seven newly impacted institutions in 2025.

51. Plaintiff receives inquiries from around the state and must respond via legal mail. Thus, it is extremely likely that Plaintiff will receive inquiries from each of the impacted institutions before the Legal Mail Policy Variance expires and will have to respond by sending legal mail into the seven newly impacted institutions.

52. When sending legal mail, OJPC attorneys and support staff use the ODRC mandated control number system. This is found under Policy 75-MAL-03 §VI(A) et seq. (hereinafter, the "Original Legal Mail Policy").

53. Defendant Annette Chambers-Smith, in her capacity as Director of ODRC, approved the unconstitutional legal mail variance, thereby requiring SOCF, MCI, LeCI, RCI, AOCI, CCI, FMC, LoCI, MaCI, ORW, and ToCI to implement the variance. *See* O.R.C. §5120.01 (describing duties of the director of ODRC). Defendant has the authority to impose rules and regulations on ODRC facilities and employees. *Id.*

54. Defendant Cynthia Davis, in her capacity as Warden of SOCF, has executive control over SOCF, subject to the rules of ODRC. *See* O.R.C. §5120.38.

55. Defendant George Frederick, in his capacity as Warden of MCI, has executive control over MCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

56. Defendant Doug Luneke, in his capacity as Warden of LeCI, has executive control over LeCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

57. Defendant Bill Cool, in his capacity as Warden of RCI, has executive control over RCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

58. Defendant Ryan Walters, in his capacity as Warden of AOCI, has executive control over AOCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

59. Defendant Tim Shoop, in his capacity as Warden of CCI, has executive control over CCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

60. Defendant Malcom Heard, in his capacity as Warden of FMC, has executive control over FMC, subject to the rules of ODRC. *See* O.R.C. §5120.38.

61. Defendant Aaron Mohr, in his capacity as Warden of LoCI, has executive control over LoCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

62. Defendant Jenny Hildebrand, in her capacity as Warden of MaCI, has executive control over MaCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

63. Defendant Erin Maldonado, in her capacity as Warden of ORW, has executive control over ORW, subject to the rules of ODRC. *See* O.R.C. §5120.38.

64. Defendant Michael Swartz, in his capacity as Warden of ToCI, has executive control over ToCI, subject to the rules of ODRC. *See* O.R.C. §5120.38.

65. The Warden Defendants are charged with implementing ODRC policies and procedures, directing and supervising their staff, and ensuring that their staff follow ODRC policies

and procedures, as well as ensuring that the incarcerated individuals under their care have their constitutional rights respected.

**A.** **The Pre-Variance Legal Mail Procedure ("Original Legal Mail Policy") in ODRC Facilities**

66. Since July 1, 2021, attorneys who need to send legal mail to ODRC facilities have been required to obtain a control number.

67. The control number system requires that legal mail be accompanied by a unique control number.

68. To obtain control numbers, one must register with ODRC as an attorney, legal services provider, or other legitimate entity related to legal services or the courts.

69. To register with ODRC to obtain control numbers, an attorney must provide their name, business address, bar number, and other information to identify themselves. ODRC then verifies this information.

70. If necessary, ODRC will verify the information by calling the attorney.

71. Control numbers are generated using a secure website which only registered attorneys or legal service providers can log into.

72. After generating a unique control number, the control number can be designated as "assigned" to a piece of legal mail to indicate that the attorney has used it.

73. The assigned control number must be placed by the attorney on the legal mail envelope.

74. When legal mail is received by an institution, the control number is verified and the envelope is briefly inspected for obvious signs of contraband. Policy 75-MAL-03 §VI(A)(1)-(2).

75. If the envelope contains no sign of contraband, staff log receipt of the mail on the Legal Mail Log and open the mail in the presence of the addressee. §VI(A)(3).

76. ODRC Policy #75-MAL-01 §VI(B)(4) provides that prison staff may read and copy all mail *except* legal mail.

77. Under the Original Legal Mail Policy, prison staff are not allowed to copy legal mail letters under any circumstances. Legal mail envelopes may be copied in extenuating circumstances. ODRC Policy #75-MAL-03 §(VI)(A)(4-5).

78. A person seeking to abuse the legal mail system by writing a fictitious control number on an envelope could easily be caught as the number would not be able to be verified.

**B. The Control Number System Successfully Addressed the Problem of Abuse of the Legal Mail System**

79. The control number system has drastically reduced misuse of legal mail.

80. ODRC tracks the incidence of major contraband[1] in legal mail.

81. The only major contraband found in purported legal mail between 2020 and 2024 has been drugs.

82. Upon information and belief, a synthetic drug commonly referred to as "toon" has been introduced into ODRC facilities by being sprayed on paper or soaked into paper.

83. In 2020, there were 370 incidents where contraband was found inside purported legal mail, and in 2021, there were 228 incidents where contraband was found inside purported legal mail. However, in 2020, the contraband was found in the mailroom 354 out of 370 times, indicating that the contraband did not reach other parts of the prison, and thus, did not become available to incarcerated persons. Similarly, in 2021, in 218 of the 228

---

[1] ODRC defines "major contraband" as "items possessed by an inmate which, by their nature, use, or intended use, pose a threat to security or safety of inmates, staff or public, or disrupt the orderly operation of the facility…" or related to "unauthorized group activity," or items such as deadly weapons, drugs of abuse, intoxicating liquor, and cash. Ohio Admin. Code §5120-9-55(A)(1).

incidents where contraband was found in purported legal mail, the contraband was found in the mail room. Ex. F, Legal Mail-Major Contraband Data.

84. According to data furnished by ODRC, in June 2021, there were 11,621 pieces of incoming legal mail sent to ODRC facilities.

85. However, after the control number system was implemented in July 2021, incoming legal mail fell precipitously. In August 2022, 4,923 pieces of incoming legal mail were sent to ODRC facilities. This number continued to fall and between January 2024 and December 2024, each month saw between 2,812 and 3,739 pieces of legal mail sent to ODRC facilities. *See* Ex. F, Legal Mail Chart, at p.48.

86. Upon information and belief, this drop in incoming legal mail is attributable to the control number system, which verifies legal mail is coming from a legitimate source.

87. In 2022, after the control number system was implemented, there were only twenty-two incidents where contraband was detected in purported legal mail. Of those incidents, contraband was discovered outside the mailroom only twice. *Id.*

88. In 2023, there were only nine incidents where major contraband was detected in purported legal mail. Of those incidents, contraband was discovered outside the mailroom only twice. *Id.*

89. In 2024, there were only six incidents where major contraband was detected in purported legal mail, and the contraband was discovered in the mailroom each time. *Id.*

90. So far, in 2025, there has been only one incident where major contraband was discovered in legal mail. *Id.* This contraband was discovered in the mailroom. *Id.*

**C. The Legal Mail Policy Variance**

91. On November 14, 2024, Defendant Chambers-Smith approved the challenged Legal Mail Policy Variance.

92. The Legal Mail Policy Variance became effective on December 2, 2024 at SOCF, LeCI, and MCI, and at RCI on April 1, 2025. It became effective at AOCI, CCI, FMC, LoCI, MaCI, ORW, and ToCI on June 1, 2025.

93. The Legal Mail Policy Variance now expires on September 1, 2025.

94. Despite the stated expiration date, the variance request approved by Defendant Chambers-Smith states that the variance "is anticipated to replace the current process [of] opening legal mail." Ex. A, at 1.

95. The Legal Mail Policy Variance replaces ODRC Policy #75-MAL-03 §(VI)(A)(4-5). In other words, the prohibition against copying legal mail is removed, and the requirement that copying legal mail envelopes only because of "legitimate security concerns" is removed.

96. The Legal Mail Policy Variance, as in the Original Legal Mail Policy, requires that legal mail be opened in the presence of the incarcerated person. Ex. A at §1.

97. Under the Legal Mail Policy Variance, all legal mail letters are handled by prison staff for an extended period of time. While it would take only a few seconds to open an envelope and remove the letter from the envelope, it will take several minutes to complete the copying and shredding process.

98. If an officer determines that the mail is "suspicious, or needs further investigation," the entire document will be confiscated. Ex. A at §2.

99. The policy does not define what constitutes mail that is "suspicious or needs further investigation."

100.    If the document is not deemed to be "suspicious or need[ing] further investigation," a staff member will copy the document in the presence of the incarcerated person, using a copier that has no memory. Ex. A at §3(i).

101.    The incarcerated person will be shown the original and allowed to compare the copy to the original to ensure the correct number of pages is in the copy and the copy is legible. Ex. A, at §3(iv).

102.    If there is a dispute over whether the copy is correctly done, prison staff are empowered to further intrude upon the confidences contained in the legal mail by checking to see if an error has been made and then correct it. Ex. A, at §3(iv).

103.    People in prison are disproportionately likely to be illiterate or have limited literacy. *See* Corey Michon, *Uncovering Mass Incarceration's Literacy Disparity,* April 1, 2016, Prison Policy Initiative, available at https://www.prisonpolicy.org/blog/2016/04/01/literacy/#appendix (last accessed April 28, 2025). Thus, it is likely that in some cases, incarcerated people will take an extended period of time to determine whether their legal mail was correctly copied or be unable to determine whether the same content is in both the copy and the original, requiring them to spend a significant amount of time reviewing their privileged correspondence in view of prison staff.

**D.  The Legal Mail Policy Variance is Substantially More Intrusive than The Mere Opening of Legal Mail by Prison Staff.**

104.    Practically speaking, it is highly likely that an individual's legal mail will be read by officers during the process of copying the mail because copying the document will naturally require the staff member to lay eyes on the document.

105.     On April 23, 2025, Plaintiff had the opportunity to view the legal mail copying process at LeCI. Ex. B, Decl. of Susan Shellenberger,

106.     On April 23, 2025, civilian staff member at LeCI copied confidential legal mail under the supervision of mailroom Lieutenant Holley. *Id.* at ¶8-9.

107.     At LeCI, when incarcerated individuals come to pick up their legal mail, they stand at the door to the legal mail room. *Id.* at ¶11. The door has an open window. *Id.* The copier used to copy legal mail is about ten feet away from where incarcerated people stand. *Id.* at 11-12.

108.     At LeCI, the copier used to copy the legal mail uses an automatic feeder or can be used by opening the lid and laying the document on the glass. *Id.* at ¶12. The shredder used for legal mail is small and can only shred a few pages at a time. *Id.* at ¶13.

109.     It was obvious throughout the process that there were many instances where at least some of the legal mail was exposed and able to be read. *Id.* at ¶14.

110.     It would take only a few seconds for a legal mail envelope to be opened and taken out of the envelope, but the entire process of photocopying and shredding would take several minutes. *Id.* at ¶15.

111.     Mailroom staff would frequently fan out pages while looking at the pages. *Id.* at ¶16. When a paper jam occurred, staff would take the pages out, flip them over and lay them to the side. *Id.* at ¶17. When this happened, staff would also hold up the front pages when handling the pages, and it was able to be read by anyone in the mailroom. *Id.* at ¶17.

112.     Often, the paper would not be shred immediately but would remain on the table next to the copier for anyone to see. *Id.* at ¶18.

113.    The shredder can only shred a few pages at a time. So, each time paper is shredded, staff would look at the sheet on top of the stack of a few pages being shredded, watch the paper go through the shredder, and repeat until the process was complete. *Id.* at ¶33. To shred a larger packet of paper, staff would have the opportunity to look at several pages throughout the shredding process. *Id.* at ¶33.

114.    When incarcerated people were given the opportunity to compare the original and the copy before shredding, mailroom staff would go through the pages with the incarcerated person. Sometimes, this could take several minutes. *Id.* at ¶19-20; 41.

115.    At one point, an error was discovered when mailroom staff and an incarcerated person were comparing the original and the copy of a piece of legal mail. *Id.* at ¶28. When this occurred, mailroom staff took back the originals, fanned through them, and left the first attempt at the copy face up on top of the printer, and thus exposed most of the content to the staff member copying the legal mail. *Id.* at ¶28-29.

116.    In sum, the implementation of the Legal Mail Policy Variance at LeCI has created a situation where mailroom staff have several opportunities over several minutes to handle, inspect, and read confidential legal mail, through the natural process of copying legal mail, comparing the legal mail copies and originals with the incarcerated people who receive the legal mail, and shredding the originals. *Id.* at ¶46.

117.    While there may be differences in how each impacted institution implements the Legal Mail Policy Variance, LeCI is following the letter of the policy, indicating that a similar level of intrusion occurs at each institution.

118.    The Ohio Rules of Professional Conduct forbid attorneys from revealing confidential information obtained in the course of an attorney-client relationship. Ohio

Prof. Cond.R. 1.6. Attorneys also have a duty to keep information obtained from persons seeking legal representation confidential. Ohio Prof. Cond.R. 1.18(b).

119.     OJPC, by sending confidential information to SOCF, MCI, RCI, LeCI, AOCI, CCI, FMC, LoCI, MaCI, ORW, and ToCI will risk their clients' confidences being exposed to prison staff via the process of inspection and copying.

120.     OJPC staff is specifically deterred from sending legal mail surrounding sensitive matters, such as those involving corrections officers or the state of an incarcerated person's living conditions as these matters could be directly prejudiced by corrections officers reading this mail.

121.     OJPC therefore has to choose between communicating with its clients and potential clients at the impacted institutions in a manner that potentially breaches their duty of keeping privileged communications or replacing all legal mail with in-person visits.

122.     Due to OJPC's small staff and the volume of inquiries, it would be unduly burdensome to cease the use of legal mail.

123.     Since OJPC cannot replace its use of legal mail with in-person visits, OJPC is forced to continue to communicate with its clients via legal mail, placing their clients' confidential information in jeopardy, breaking the attorney-client privilege, and placing their attorneys at risk of discipline.

**E.  The Legal Mail Policy Variance Does Not Reasonably Relate to a Legitimate Penological Interest.**

124.     Incarcerated people have a fundamental right to access the courts and the legal system, including by corresponding with attorneys.

125.     People on the "outside" have a fundamental right to communicate with incarcerated individuals.

126.     The Legal Mail Policy Variance burdens the fundamental rights of both OJPC attorneys and incarcerated individuals.

127.     The Original Legal Mail Policy already provides protection against misuse of legal mail. When sending legal mail to a prison, the control number system will catch misuse of legal mail. Furthermore, the fact that an attorney's name and law office is associated with a piece of legal mail that is misused to convey drugs into the prison, would provide a significant deterrent to the attorney's misuse of the legal mail system.

128.     ODRC already has many safety valves in place if purported legal mail is suspicious or appears to contain contraband. For example, the mail could be returned to the sender or withheld as contraband. See ODRC Policy #75-MAL-03(VI)(B)-(C).

129.     Contraband can be detected by using drug-sniffing canines, checking for a stained or wet exterior, or evidence of tampering. ODRC Policy #75-MAL-03(VI)(B)(1).

130.     Data furnished by ODRC has shown that the incidence of contraband being found in purported legal mail is very low. Only six such incidents occurred in 2024, and only one incident has occurred so far in 2025. After the control number system was implemented, the amount of purported legal mail drastically fell, as did the incidence of contraband in purported legal mail.

131.     Given the measures already in place to ensure that legal mail is secure under the Original Legal Mail Policy, allowing for inspection and copying of all legal mail as described in the Legal Mail Policy Variance is overbroad.

132.    The control number system under the Original Legal Mail Policy is a reasonably available alternative to the Legal Mail Variance because it deters misuse of the legal mail system by attorneys or non-attorneys posing as attorneys and has been proven to reduce the number of times contraband appears in purported legal mail to the point that there were only six such incidents in 2024, and only one incident so far in 2025. Additionally, since 2024, no contraband has been detected in legal mail outside the mailroom.

133.    OJPC and its attorneys have been injured by the fact that prison officials have read and photocopied confidential legal mail sent to individuals who reside at the four impacted prisons and will continue to do so.

134.    OJPC's clients have been injured by the fact that prison officials have read and photocopied their confidential legal mail, and/or will certainly do so in the future.

135.    OJPC and its attorneys are at imminent risk of injury because prison officials will read and photocopy confidential legal mail sent to individuals who reside at the seven newly impacted prisons.

136.    The breaking of attorney-client privilege is an irreparable harm.

137.    The Legal Mail Policy Variance does not reasonably relate to a legitimate penological interest.

138.    The Legal Mail Policy Variance prevents attorneys from communicating privately with their clients, thereby impairing an incarcerated person's right to seek legal assistance and otherwise communicate with the outside world.

139.    The Legal Mail Variance goes significantly further than what is required to prevent the conveyance of contraband through legal mail, and disregards reasonably available alternatives that have deterred misuse of the legal mail system.

## V.     FIRST CAUSE OF ACTION: 42 U.S.C. §1983
### (Against All Defendants)

140.     Defendants, acting under color of state law, have violated and continue to violate the rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the U.S. Constitution.

141.     With regards to OJPC and its attorneys, these rights include the right to communicate with incarcerated people, the right to freedom of speech and expression, the right to practice their profession absent unreasonable government regulation, and the right to due process of law.

142.     With regards to OJPC's currently incarcerated clients, these rights include the right to communicate with the outside world, the right to access the courts and the legal system, the right to freedom of speech and expression, the right to petition the government for redress of grievances, and the right to due process of law.

## VI.     PRAYER FOR RELIEF

143.     WHEREFORE, Plaintiff respectfully requests that this court grant:

**a.** A declaratory judgment that the Legal Mail Policy Variance violates the First and Fourteenth Amendments of the U.S. Constitution as applied to OJPC attorneys and its incarcerated clients;

**b.** Preliminary and permanent injunctive relief against all Defendants in their official capacities, forbidding them and their agents from implementing the Legal Mail Policy Variance;

**c.** An award of attorneys' fees and costs pursuant to 42 U.S.C. §1988; and

**d.** Such further relief as the court deems just and proper.

Respectfully Submitted,

**/s/Mark A. Vander Laan**
Mark A. Vander Laan (0013297)
Trial Attorney for Plaintiff
Angela S. Larsen (0105189)
Lizett M. Schreiber (0084708)
Attorneys for Plaintiff
Ohio Justice and Policy Center
215 E. 9th Street, Suite 601
Cincinnati, Ohio 45202
(513) 421-1108
(513) 562-3200 (fax)
mvanderlaan@ohiojpc.org
alarsen@ohiojpc.org
Dated:  June 5, 2025

**VERIFICATION**

1. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the facts stated above are true and correct.

2. I, Gabriel A. Davis, am the Chief Executive Officer of Plaintiff Ohio Justice and Policy Center. I am authorized to make this verification on OJPC's behalf.

3. I have read this *Verified Amended and Supplemental Complaint for Declaratory and Injunctive Relief* and verify that the matters stated herein are true and correct to the best of my knowledge.

Executed on _____June  4_____, 2025

_____

Gabriel A. Davis

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2025, the foregoing was filed with the Court's

electronic filing system, and sent via electronic mail to:

      D. Chadd McKitrick
      Senior Assistant Attorney General, Unit Coordinator
      Criminal Justice Section, Corrections Litigation Unit
      Office of Ohio Attorney General Dave Yost
      30 East Broad Street, 23rd Floor
      Columbus, Ohio 43215
      Daniel.McKitrick@OhioAGO.gov


      (Agreed to accept service on behalf of newly added Defendants Walters, Shoop, Heard, Mohr, Hildebrand, Maldonado, and Swartz  )


                                  **<u>/s/Mark A. Vander Laan</u>**
                                    Mark A. Vander Laan (0013297)