# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION
## CINCINNATI, OH

| | |
|---|---|
| **Ohio Justice and Policy Center** <br> *Plaintiff,* | Case No: 1:25-cv-291 |
| | Judge: Douglas R. Cole |
| **vs.** | Magistrate Judge: |
| **Annette Chambers Smith, et al.** <br> *Defendants.* | |
| | **AMENDED MOTION FOR PRELIMINARY INJUNCTION** |

Pursuant to Fed. R. Civ. P. 65, Plaintiff Ohio Justice and Policy Center moves for preliminary injunctive relief requiring Defendants to cease implementation and enforcement of the unconstitutional Legal Mail Policy Variance. Plaintiff files this amended motion to reflect the addition of new Defendants and the expansion of the challenged policy since the initial filing of the original motion. A memorandum of law in support of this motion is attached.

Respectfully Submitted,

**/s/Mark A. Vander Laan**
Mark A. Vander Laan (0013297)
Trial Attorney for Plaintiff
Angela S. Larsen (0105189)
Lizett M. Schreiber (0084708)
Attorney for Plaintiff
Ohio Justice and Policy Center
215 E. 9th Street, Suite 601
Cincinnati, Ohio 45202
(513) 421-1108
(513) 562-3200 (fax)
mvanderlaan@ohiojpc.org
alarsen@ohiojpc.org
lschreiber@ohiojpc.org
Dated: June 6, 2025

<u>**MEMORANDUM IN SUPPORT**</u>

**I.      FACTS**

Plaintiff Ohio Justice and Policy Center ("OJPC") brings this action to vindicate the rights of its attorneys and clients to have confidential attorney-client communications via the mail. This fundamental right has been gravely threatened by the unconstitutional Legal Mail Policy Variance, which allows for photocopying of legal mail at eleven ODRC facilities: Southern Ohio Correctional Facility ("SOCF"), Marion Correctional Institution ("MCI"), Lebanon Correctional Institution ("LeCI"), Ross Correctional Institution ("RCI"), Allen Oakwood Correctional Institution ("AOCI"), Chillicothe Correctional Institution ("CCI"), Franklin Medical Center ("FMC"), London Correctional Institution ("LoCI"), Madison Correctional Institution ("MaCI"), Ohio Reformatory for Women ("ORW"), and Toledo Correctional Institution ("ToCI").  Merely opening legal mail is acceptable and not invasive because it only takes a few seconds. By contrast, the Legal Mail Policy Variance leads prison staff to handle legal mail for several minutes with a multitude of opportunities to read the legal mail as they handle it, scan it, compare the copy and the original with the incarcerated person, and shred the original. *See* Verified Amended and Supplemental Complaint, at ¶¶104-117. The challenged Legal Mail Policy Variance is attached as Exhibit A.[1]  Plaintiff does not argue that this intrusion is the result of arbitrary action or deliberate attempts to breach confidences by prison staff, but rather, the intrusion is a direct and natural consequence of following the Legal Mail Policy Variance.

**1.   Confidential Legal Mail is Indispensable to OJPC's Attorneys and Clients.**

Every month, OJPC receives dozens of inquiries from incarcerated people living in Ohio's state prisons every month seeking legal assistance. Verified Amended and Supplemental

---

[1] Previous Versions are attached as Exhibit A-1 (Legal Mail Policy Variance Effective 12/2/24) and A-2 (Legal Mail Policy Variance Effective 4/1/25),

Complaint, at ¶25. Upon receipt of such inquiries, OJPC sends them an application for services and release forms to fill out, sign, and return. *Id.* at ¶26. OJPC must use the mail to communicate with clients. Aside from visits and legal mail, the Ohio Department of Rehabilitation and Correction ("ODRC") offers attorney phone calls on a limited basis. *Id.* at ¶42-45. Even if legal calls were more widely available, clients cannot sign representation agreements or release forms over the phone, and attorneys must also send documents in the mail to clients as needed. *Id.* at ¶46. Additionally, the confidentiality of attorney phone calls is limited because incarcerated persons make calls directly via their tablets and are not afforded a private room in which to conduct the call. *Id.* at ¶45. It is unrealistic and impractical for OJPC's small team of attorneys and support staff to schedule a visit with every person who inquires seeking legal assistance to have them sign releases and fill out our application to request and access representation. *Id.* at ¶101-103. Therefore, legal mail is indispensable to Plaintiff.

The challenged Legal Mail Policy Variance requires that all incoming legal mail from attorneys be copied, and then the original shredded. Ex. A. When confidential legal mail arrives at the prison, all legal mail letters will be removed from the envelope by prison staff, held by the officers, and placed in a photocopier by the officers. At the very least, parts of the correspondence will be exposed to officers. While the policy only calls for "inspection" of the legal mail, the copying process takes much longer than a typical cursory inspection of legal mail to ensure it is legitimate. Because of the time and effort necessarily involved in copying a document, it is almost certain that the officer opening and copying the documents will read the documents, simply by the natural process of laying their eyes on the document. This is a significantly increased invasion into privileged and confidential communications.

3

Free, open, and honest communication between attorney and client is a bedrock of our legal system. Without the ability to communicate privately with an attorney, incarcerated people cannot vindicate their legal rights more generally because they will understandably fear that their desire to challenge actions by prison officials will become known and lead to retaliation and interference with their rights.

### 2. The Legal Mail Policy Variance Forces OJPC to Communicate in a Non-Confidential Manner.

The Legal Mail Policy Variance replaces the current ODRC Policy #75-MAL-03 §VIA.4-5, which governs the processing of legal mail. The variance removes the prohibition against copying legal mail. The policy variance, as in the governing policy, requires that legal mail be opened in the presence of the incarcerated person. If an officer determines that the mail is "suspicious, or needs further investigation," the entire document will be confiscated. Ex, A, Variance §2. If the document is not "suspicious," a staff member will copy the document in the presence of the incarcerated person, using a copier that has no memory. Ex. A, Variance §3(i). The incarcerated person will be shown the original and allowed to compare it to the original to ensure the correct number of pages is in the copy and the copy is legible. Ex. A, Variance §3(i).

The act of photocopying legal mail naturally will lead to reading at least parts of it. The extended handling required to place the legal mail in the photocopier, then remove the mail from the copier, and then shred the original, will inevitably lead to reading of the mail. OJPC attorneys are thus forced to risk violating their professional duties of confidentiality or stop communicating with incarcerated people. Ohio Prof. Cond. R. 1.6 (duty of confidentiality to current clients); Ohio Prof. Cond. R 1.18(b) (duty of confidentiality to prospective client). To be clear, Plaintiff does not contend that the reading is a result of any individual staff members or

officers acting deliberately or in bad faith; the intrusion is a natural and inevitable consequence of the policy.

The implementation of the Legal Mail Policy Variance at LeCI shows that Plaintiff's concerns are not hypothetical. The process takes several minutes to complete. Ex. B, Declaration of Susan Shellenberger, at ¶46. There are many opportunities for staff processing legal mail to look at the content of the legal mail letters long enough to read it. *Id.* Often, parts of legal mail were visible to others in the mailroom. *Id.* at ¶22. When legal mail is photocopied, the legal mail letter is placed face up on the copier and staff will watch at least parts of it be fed into the copier. *Id.* at ¶25. The copier is approximately ten feet away from where incarcerated individuals watch their mail be processed. *Id.* at ¶11-12. The distance between the copier and where incarcerated people stand to watch may interfere with their ability to view their legal mail be processed.

Mailroom staff looks at individual pages as they are being copied or shredded, looks at pages to fix paper jams, fans out and flips through packets of legal mail, and even looks at each page with the incarcerated person as they compare the copies and the originals. *Id.* at ¶46. When a paper jam occurred, staff took the pages out, flipped them over, laid them to the side, and even held up the front page in full view of all in the mailroom. *Id.* at ¶17. It can take incarcerated people several minutes to confirm that their copies are complete and accurate. *Id.* at ¶41. Incarcerated people are forced to allow for further intrusion into their legal mail, as staff would often go through the pages with the incarcerated person, to ensure their copies are correct. *Id.*

At LeCI, the shredder is only capable of shredding a few pages at a time. *Id.* at ¶34. Thus, if legal mail contains a large number of pages, it will have to be fed a few pages at a time. *Id.* For example, if three pages were being shredded at a time, the top page would be exposed, and after those three pages were shredded, another set of pages would be placed into the shredder with the

top page exposed. *Id.* Mailroom staff would look at the pages as they were fed into the shredder. *Id.* at ¶33.

Moreover, since the Legal Mail Policy Variance came into effect, OJPC has confirmed at least one incident where staff at an impacted institution has read aloud confidential legal mail on the phone to OJPC. *See* Ex. C, Kilguss Declaration. Additionally, one individual with whom OJPC has corresponded as a potential client had his mail opened and photocopied outside of his presence after the implementation of the Legal Mail Policy Variance. Ex. D, Dennis Pointer Declaration. The second time he received confidential legal mail from OJPC, his mail was again opened outside his presence, but his mail was copied in his presence. *Id.*

### 3. Defendants Have Already Implemented the Control Number System, Which Has Eliminated Bogus Legal Mail as a Source of Contraband.

In July 2021, ODRC began requiring attorneys to use a "control number" for each piece of legal mail. Ex. E, May 10, 2021 "Information for Attorneys" Letter. Control numbers are only available to attorneys, legal service providers, courts, and other government agencies that need to communicate confidentially with incarcerated people. *Id.* To obtain control numbers, one must register as an attorney or law firm.[2] ODRC must first confirm that the person registering is an actual attorney. *Id.* Each piece of legal mail must have a unique control number, which is generated online using a website maintained by ODRC. *Id.* When legal mail is received, prison staff must verify the control number. *Id.*

After the control number system was implemented, the amount of legal mail sent to ODRC facilities fell drastically, indicating that the control number system had the effect of preventing people from impersonating attorneys as a means of bypassing the ordinary mail inspection

---

[2] Other entities are eligible to receive control numbers, such as courts.

procedures. Data from ODRC indicates that the only form of major contraband[3] found in legal mail from 2020-2024 was drugs. Ex. F, ODRC Major Contraband-Legal Mail Data. In 2020, contraband was found inside purported legal mail 370 times. *Id.* However, almost every time, the contraband was discovered inside the mailroom. *Id.* The contraband was found in a place outside of the mailroom only sixteen times. *Id.* Similarly, in 2021, there were 230 incidents where contraband was found in purported legal mail, but there were only eighteen instances where the contraband was found outside the mailroom. *Id.* Therefore, in almost all of these cases, contraband would have been intercepted before it made its way further into the facility, where it would be accessible to incarcerated people.

In contrast, between 2022 and 2024, only 38 purported legal mail letters were found to contain contraband. *Id.* In 2022, the contraband was discovered outside the mailroom twice. *Id.* In 2023, the contraband was also only found outside the mailroom twice. *Id.* In 2024, there were only six incidents where purported legal mail contained contraband, and all contraband was detected inside the mailroom. *Id.* So far in 2025, there has only been one incident where contraband was detected in purported legal mail, and it was also found inside the mailroom. *Id.* Therefore, ODRC has no evidence of contraband hidden inside legal mail making its way out of the mailroom since 2023. If contraband is caught inside the mail room, that indicates that prison staff prevented the contraband from leaving to other areas of the prison, where incarcerated people live and congregate. In other words, Defendants have no evidence that contraband became available for incarcerated people to use as a result of legal mail since 2023.

## II.     LEGAL ARGUMENT

---

[3] ODRC Defines "major contraband" as "items possessed by an [incarcerated person] which, by their nature, use, or intended use, pose a threat to security or safety of [incarcerated persons], staff or public, or disrupt the orderly operation of the facility…" or related to "unauthorized group activity," or items such as deadly weapons, drugs of abuse, intoxicating liquor, and cash. Ohio Admin. Code §5120-9-55(A)(1).

1. **Legal Standard for a Preliminary Injunction.**

In deciding whether to issue a or a preliminary injunction, courts must consider four factors: 1) whether the movant has a strong likelihood of success on the merits; 2) whether the movant would suffer irreparable injury without the injunction; 3) whether issuing the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction. *City of Pontiac Retired Emples. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014). These four factors are not prerequisites; they are factors to be balanced against each other. *Jones v. Caruso*, 569 F.3d 258, 266-67 (6th Cir. 2009). Notwithstanding this balancing test, when a party seeks an injunction based on a potential First Amendment violation, the likelihood of success is generally the determinative factor. *Id.* at 266.

Balancing the four factors enumerated above, this Court should grant a preliminary injunction as there is a strong likelihood of success on the merits, OJPC and its clients have suffered and will continue to suffer irreparable injury without a preliminary injunction, issuing the injunction will not cause substantial harm to others, and the public interest will be served by issuing the injunction. Therefore, the circumstances demand an injunction in this matter.

a) **Plaintiffs are Likely to Succeed in their Challenge to the Legal Mail Variance**

Indisputably, "[p]rison walls do not form a barrier separating [incarcerated people] from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). When a party seeks a preliminary injunction based on a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). The Legal Mail Policy Variance is a prison regulation that impacts a fundamental constitutional right—namely, the rights to communicate with the outside world --- specifically with attorneys, and access to courts and the legal system. Therefore, the regulation

8

will be reviewed under the standard enumerated by the Supreme Court in *Turner.* 482 U.S. 78 at

89-91. Applying the *Turner* standard, Plaintiff will likely prevail on the merits of their

constitutional claim, and this Court should give this factor the strong weight it commands.

> **i)** **The "Reasonably Related to a Legitimate Penological Interest" Test Enumerated in *Turner v. Safley* Governs Judicial Review of Prison Regulations that Burden Constitutional Rights.**

In *Turner,* the Supreme Court established the standard governing judicial review of

prison regulations that burden a fundamental right. 482 U.S. at 92. Prison officials do not have

unlimited discretion, and under *Turner,* a prison regulation that burdens a constitutional right is

valid if it is "reasonably related to a legitimate penological interest." *Id.* at 89. While the standard

allows for discretion consistent with prison administrators' expertise, the standard is certainly not

"toothless," and places limits on discretion. *Thornburgh v. Abbott,* 490 U.S. 401, 414 (1989).

The Supreme Court has enumerated *Turner* factors to consider: 1) whether there is a valid and

rational connection between the prison regulation and the legitimate governmental interest that

justifies the regulation; 2) whether there are alternative means of exercising the right that remain

open to the incarcerated people; 3) the impact of accommodating the asserted right on the

allocation of prison resources, corrections officers, and other incarcerated individuals; and 4)

whether there are alternatives. *Turner,* 482 U.S. at 89-90. "The existence of obvious, easy

alternatives may be evidence that the regulation is not reasonable but is an exaggerated response

to prison concerns." *Id.* at 90.

The Legal Mail Variance is subject to the *Turner* test because it impugns Plaintiff's

constitutional rights, namely the right to freedom of speech, the right to communicate with

incarcerated individuals, the right to practice law consistent with the Rules of Professional

Conduct, and the right to due process. An attorney's right to communicate with incarcerated

people is essential to protecting the rights of incarcerated people's access to courts and the legal system. *ACLU Fund of Mich. v. Livingston Cty.,* 796 F.3d 636, 643 (6th Cir. 2015). Exercise of this right does not require an existing attorney-client relationship. *Id.* at 649. Both attorneys and incarcerated people have a strong interest in confidential communications, even in the initial investigative stage of a legal matter. *Id.* at 644. Applying these principles, the Sixth Circuit held in *ACLU Fund of Mich.* that protections available to confidential attorney-client communication could not be limited to communications related to an active legal matter. *Id.* at 638. So, mail from the ACLU to incarcerated people seeking information about a jail policy they were considering a challenge to was protected legal mail. *Id.*

Additionally, an incarcerated person's right to receive mail is protected by the First Amendment. *See Procunier v. Martinez,* 416 U.S. 396, 406 (1974). Moreover, it is well-settled that incarcerated individuals have a fundamental right to access the courts, including by corresponding with attorneys. *Sallier v. Brooks*, 343 F.3d 868, 877-78 (6th Cir. 2003). An incarcerated person's "interest in unimpaired, confidential communication with attorneys is an integral component of the judicial process." *Id.* The paramount importance that the attorney-client privilege plays in our legal system has long been recognized. *See Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) (observing that "[t]he rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.") A system in which a prison staff member can become aware of the substance of the legal matter communicated would defeat the purpose of

protecting legal mail, as potentially adverse parties (i.e., prison staff) would become aware of the matter. *Id.* at 645.

Since the Legal Mail Policy Variance allows for the inspection and copying, and in doing so, almost certainly the reading of at least parts of the legal mail, the challenged policy therefore burdens Plaintiff's and Plaintiff's clients' constitutional rights, including the right to communicate with the outside world, the right to a confidential attorney-client relationship, the right to access the courts and the legal system, and the right to due process of law.

### ii) Access to Confidential Legal Mail is a Constitutional Right for both OJPC's Attorneys and Clients.

Both attorneys and clients retain a fundamental interest in the confidentiality of their communications regarding legal matters. *ACLU Fund of Mich.,* 796 F.3d at 644. The right to confidential attorney-client communication applies whether the matter is in the initial investigation stage or has proceeded to litigation. *Id.* In approving of policies that require legal mail to be opened in the presence of the incarcerated person where he requests it, the Sixth Circuit has noted that the "interest in unimpaired, confidential communication with an attorney is an integral component of the judicial process." *Sallier,* 343 F.3d at 877-78. When the right at issue is the right to receive confidential legal mail, the Sixth Circuit reviews policies affecting that right with a "heightened concern" towards policies that give prison officials "unfettered discretion to open and read an [incarcerated person's] mail." *Id.* at 874.

The very purpose of requiring that legal mail be opened in the presence of the incarcerated person, as articulated by the Supreme Court in *Wolff,* is to prevent reading legal mail. *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974). The interest an incarcerated person maintains in keeping their legal mail confidential prevents the chilling of their First Amendment rights. *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994). Further, the Sixth Circuit has

recognized that mail related to an incarcerated person's legal matters may not be read. *Sallier*, 343 F.3d at 874.[4] The act of inspection and copying will inevitably lead to prison staff reading incoming legal mail, compromising at least the essential right to a confidential attorney-client relationship, and risking further that prison staff may become aware of a complaint an incarcerated person has against a particular staff member and taking retaliatory action, or otherwise interfering with their rights to the courts and the legal system.

### iii) The Right to Communicate with Incarcerated People is a Constitutional Right Subject Only to Reasonable Prison Regulations.

As applied to OJPC's attorneys, the Legal Mail Policy Variance is invalid because it fails to respect their fundamental rights to communicate with people in prison. *Thornburgh,* 490 U.S. at 407. As applied to OJPC attorneys, who are not incarcerated, the policy will also be analyzed under *Turner. Id.* at 414. While the rights of "outsiders" must also be balanced against the legitimate needs of prison administrators, non-incarcerated people retain the right to communicate with people in prison. *Id.* at 408. While *Turner* generally regulates prison policies that burden constitutional rights, the Sixth Circuit has also found that courts should apply "heightened concern" to legal mail, due to the multitude of rights impacted by legal mail regulations. *ACLU Fund of Mich.,* F.3d at 647. Therefore, when balancing the interests at stake

---

[4] Additionally, several other circuits have recognized a right against having one's legal mail read by prison officials. *See, e.g., Smith v. Robbins,* 454 F.2d 696, 697 (1st Cir. 1972) (finding that incarcerated people have the "right to have the confidence between himself and his counsel totally respected" and thus legal mail may not be read); *Gardner v. Howard,* 109 F.3d 427, 431 (8th Cir. 1997) (observing that "[t]he policy that incoming confidential legal mail should be opened in [the incarcerated person's] presence instead serves the prophylactic purpose of assuring them that confidential attorney-client mail has not been improperly read in the guise of searching for contraband."); *Nordstrom v. Ryan,* 856 F.3d 1265, 1272 (9th Cir. 2017) (recognizing that prison officials may inspect, but not read, outgoing legal mail); *Al-Amin v. Smith,* 511 F.3d 1317, 1334 (11th Cir. 2008) (finding that "[a]ssuring the [incarcerated person] of the confidentiality of [incarcerated person]-attorney mail by opening such mail only in the [incarcerated person']s presence actually advances the state's interest in promoting institutional order and security.")

for both the incarcerated people and prison security, legal mail is afforded greater protection than non-legal mail. *Jones,* 569 F.3d at 267.

### iv) The Legal Mail Policy Variance Fails the *Turner* Test.

As applied to Plaintiff's incarcerated clients, the regulation is invalid because it does not bear a reasonable relation to a legitimate penological interest. *Turner,* 482 U.S. at 89-91. Generally, an incarcerated person's legal mail should be opened in their presence under uniform regulations. *Kensu v. Haigh,* 87 F.3d 172, 174 (6th Cir. 1996). The "key issue" in determining what mail should be protected as "legal mail" is whether the attorney and client or potential client have an interest in maintaining confidentiality in communications regarding the matter. *ACLU Fund of Mich.,* 796 F.3d at 644. The Sixth Circuit has found that "when the incoming mail is 'legal mail,' 'heightened concern' should be applied when a policy or practice gives prison officials "unfettered discretion" to open and read an incarcerated person's legal mail because "a prison's security needs do not automatically trump a[n incarcerated person]'s First Amendment right to receive mail, especially correspondence that impacts upon or has import for the [incarcerated person's] legal rights, the attorney-client privilege, or the right of access to the courts." *Sallier,* 343 F.3d at 877-78. Improperly opening legal mail by itself implicates the First Amendment because of the potential chilling effect. *Merriweather v. Zamora,* 569 F.3d 307, 317 (6th Cir. 2009).

 Following *Turner,* prisons may only impose restrictions that are reasonably related to security or other legitimate penological interests. *Id.* at 873. Because of the fundamental right at stake, courts afford greater protection to legal mail than non-legal mail. *Id.* (citing *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir. 2003)). Thus, even when prison officials put forth a security interest, the Constitution still demands that legal mail can be opened, but not read, and inspected

for contraband, and it must take place in the presence of the recipient, if they request it. *Id.* at 874. At most, an inspection of legal mail by prison officials may include "looking at a letter to confirm that it does not include suspicious features such as maps, and making sure that illegal goods or items that pose a security threat are not hidden in the envelope." *Nordstrom v. Ryan*, 856 F.3d 1265, 1272 (9th Cir. 2017) (striking down prison policy that allowed for prison officials to "scan" outgoing legal mail to determine if it is actually legal mail). If opening the envelope is not enough to determine if the letter is legitimate legal mail, it may be opened for inspection in front of the incarcerated person, but only the signature and letterhead may be read. *Bell-Bey v. Williams*, 87 F.3d 832, 839 (6th Cir. 1996).

More recently, the Sixth Circuit held that the right of an incarcerated person to receive legal mail could not be limited to attorneys with whom the individual had an active legal matter, nor could incarcerated individuals be barred from receiving legal mail from an attorney who was sending legal mail to multiple individuals at the same institution. *ACLU Fund of Mich.*, 796 F.3d at 646-47. While *ACLU Fund of Mich*. concerned actions by jail staff that went beyond the bounds of written policy, the Sixth Circuit made clear that review of regulations related to legal mail is subject to a heightened standard. *Id.* at 643. Further, the Sixth Circuit found that the challenged rules did not have a reasonable relationship with the governmental interest asserted because the rule could not actually prevent the smuggling of contraband or non-attorneys using the legal mail to process to bypass monitoring of mail. *Id.* at 647.

### (1) The Legal Mail Policy Variance Does Not Have a Valid and Rational Connection to a Legitimate Penological Interest.

The Legal Mail Policy Variance is invalid because it does not have a reasonable relationship to a legitimate penological interest. *Turner,* 482 U.S. at 89. When incoming mail is legal mail, "a prison's security needs do not automatically trump a[n incarcerated person's] First

14

Amendment right to receive mail, especially correspondence that impacts upon or has import for the [incarcerated person's] legal rights, the attorney-client privilege, or the right of access to the courts." *ACLU Fund of Mich.,* 796 F.3d at 643 (quoting *Sallier,* 343 F.3d at 874). It is well-settled that legal mail may be inspected for contraband, but may not be read. *Sallier,* 343 F.3d at 873-74. While the Sixth Circuit has not directly spoken to the issue of photocopying legal mail, its analysis of legal mail restrictions is instructive.[5] Where a regulation carries a risk that an incarcerated person's legal mail will be read, without procedural safeguards, the regulation will not be upheld merely by reference to the asserted government security interest. *Bout v. Abramajtys*, No. 93-1383, 1994 U.S. App. LEXIS 16937, at *7 (6th Cir. July 7, 1994) (striking down prison regulation that allowed for review of outgoing mail sent by incarcerated persons to courts to ensure that it was actually related to a legal matter)., *accord Bell-Bey v. Williams,* 87 F.3d 832, 837 (6th Cir. 1996). While *Bell-Bey* also addressed an outgoing legal mail regulation, it cited the analysis in *Bout* for the proposition that a policy that did allow for an incarcerated person's legal mail to be read could chill the individual's freedom of expression and ability to access the legal system. *Bell-Bey*, 87 F.3d at 839. Although a "cursory" inspection to ensure the mail is bona fide legal mail is acceptable, inspection should be limited to ensuring the letter is in

---

[5] The Sixth Circuit affirmed a decision of the Western District of Kentucky upholding a policy allowing for the photocopying of confidential legal mail, on the basis that the appellant challenging the policy forfeited appellate review. *Johnson v. Briarily,* 2024 U.S. App. LEXIS 12264 (6th Cir. May 21, 2024). In any event, the decision of the court below is of little persuasive value. *See Johnson v. Briarly*, 2023 U.S. Dist. LEXIS 12793 (W.D. KY July 25, 2023). The pro se plaintiff did not develop any evidence to counter the prison officials' bare assertion that the policy was "reasonably related to a legitimate penological interest." *Id.* at *7. The two other times the Western District of Kentucky upheld the photocopying of legal mail, the court also had no reason put forth by the plaintiffs to question the prisons officials' asserted interests. *See generally House v. Henderson Cty. Det. Ctr*., No. 4:21-CV-00038-JHM, 2022 U.S. Dist. LEXIS 166700, at *9 (W.D. Ky. Sep. 15, 2022); *Bray v. Mazza,* No. 4:21-CV-00119-JHM, 2022 U.S. Dist. LEXIS 229551, at *1 (W.D. Ky. Dec. 21, 2022). Since *Turner,* the Supreme Court has instructed lower courts to assess the relationship between the prison interest asserted and the burden placed on the rights of incarcerated people. *Turner,* 482 U.S. at 90. When a plaintiff does not develop a record questioning the relationship between the burden on his rights and the interest asserted by prison officials, a court naturally cannot apply *Turner* to the extent it calls for a balancing of interests, and thus these cases are of little guidance to this court in the instant case, where facts are available showing the scant connection between the asserted interest of the Defendant prison officials and the burden placed on Plaintiff and their clients.

fact legal mail, such as looking for an attorney's signature and letterhead. *Id.* (quoting *Lemon v. Dugger*, 931 F.2d 1465, 1467 (11th Cir. 1991). While prisons may require that incarcerated individuals specify that they do not want their legal mail opened outside their presence, there is no penological interest that justifies opening legal mail outside the presence of an incarcerated person when they request otherwise. *Sallier,* 343 F.3d at 877.

Similarly, while ODRC may be justified in limiting paper in other contexts to prevent the importation of synthetic drugs like "toon" into their facilities, attorneys are not the culprit. Therefore, the Legal Mail Policy Variance is not rationally related to the interests of prison officials at stake. Indeed, the Sixth Circuit found that requiring an attorney attach their bar number and name would "drastically reduce" the likelihood of criminal and unethical acts by attorneys using legal mail. *Id.* at 646. Similarly, ODRC already has robust procedures to confirm that legal mail is coming from a legitimate attorney or legal service provider—the control number system. To generate a control number, attorneys must sign up on the ODRC website to confirm they are real attorneys. ODRC would have access to the attorney's name and business address, allowing for easy detection of misuse of legal mail. In fact, ensuring the confidentiality of legal mail is actually in the prisons officials' interest because it promotes their interest in security and institutional order by ensuring that incarcerated people have access to the legal system to resolve their grievances using legitimate means. *Bieregu v. Reno*, 59 F.3d 1445, 1457 (3d Cir. 1995).

When Defendants cannot put show that their policy addresses a real threat, they fail the *Turner* test at the threshold level. *See Nordstrom,* 856 F.3d at 1273 (finding that when prison put forth no evidence of asserted risks of outgoing legal mail, prison officials did not meet their burden to show a legitimate interest advanced by the policy); *Jones v. Brown*, 461 F.3d 353, 362-

16

3 (3d Cir. 2006) (prison policy that allowed for opening confidential legal mail outside the presence of incarcerated individuals could not be justified in reference to generalized knowledge related to anthrax risk, it must be justified by showing a "significant risk of anthrax contamination and thus a reasonable connection between these practices and the safety and security of their prisons.") ODRC's own data belies the conclusion that properly verified legal mail with a control number is a source of drugs in their prisons.[6] A regulation cannot be sustained when the connection between the regulation and the security of the prison is so remote. *Turner,* 482 U.S. at 89-90. At most, Defendants' concerns are hypothetical. Therefore, there is no rational connection between the Legal Mail Policy Variance and the interests of prison officials in eliminating the misuse of legal mail.

### (2) There Are No Other Reasonably Available Means Available to Plaintiff OJPC and their Clients To Exercise Their Rights.

ODRC has slowly whittled away at the methods available for attorney-client communication. While paperwork may be filled out and signed during an in-person visit, it is not realistic for OJPC's small legal team to schedule an in-person visit for every person who inquires about the possibility of receiving legal assistance. Even in the limited circumstances where unrecorded legal calls are available, releases and attorney-client agreements cannot be signed over the phone. Finally, methods such as GTL are not confidential and also do not allow for the individual to sign or fill out any necessary paperwork. When there are alternative means of exercising the right available, *Turner* calls for particular sensitivity to prison officials' discretion. *Turner,* 482 U.S. at 90. However, here, there are no alternative means to exercise the right to

---

[6] The significantly larger amount of purported legal mail coming into prisons, and the significantly higher number of incidents where contraband was found in purported legal mail before the control number system was implemented shows that while *fake* legal mail may have led to the introduction of drugs into ODRC prisons, control number verified legal mail almost never does. *See* Verified Amend. and Supp. Comp. at ¶81-90.

send and receive confidential legal mail. Therefore, this Court should find that the second *Turner* factor weighs in favor of Plaintiff.

> **(3) Exercise of the Asserted Right Will Have Little Impact on the Allocation of Prison Resources, Prison Staff, and Other Incarcerated People.**

As discussed *infra,* ODRC already has a system in place to secure confidential legal mail, and to prevent misuse of confidential legal mail. The control number system has eliminated the ability for legal mail to be misused to introduce contraband into facilities. Significant resources are put towards securing the mail regardless of whether the Legal Mail Policy Variance is in effect. Arguably, invalidating the Legal Mail Policy Variance will lead to a reduction in time and money that it takes to regulate legal mail, as the time consuming and costly process of photocopying will no longer be necessary. Prison staff will not have to spend time copying legal mail and ensuring that the photocopy matches the original. Therefore, very little "tradeoff" must be made between the rights asserted by Plaintiff and the legitimate security interests of ODRC if this Court were to grant the requested injunction. *Cf. Turner,* 482 U.S. at 92 (noting that "[w]here exercise of a right requires this kind of tradeoff, we think that the choice made by corrections officials…should not be lightly set aside by the courts.")

> **(4) There Are Readily Available Alternatives that Accommodate Both Prison Security and the Exercise of the Right to Receive Confidential Legal Mail.**

Where impacted persons "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Muhammad,* 35 F.3d at 1086. First, the control number system is already in place. The control number system requires attorneys to register with ODRC and generate a unique control number for their mail to clients. The control numbers are checked for veracity, meaning that a person seeking to

impersonate an attorney to send contraband into the institution would not be able to get a legitimate control number. Courts have recognized that requiring letters to include an attorney's name and bar number "drastically reduce" the likelihood of criminal and unethical conduct by attorneys. *ACLU Fund of Mich.,* 796 F.3d at 646-47.

While ODRC does not require attorneys to place their bar number on letters, the control number system verifies for ODRC that legal mail is coming from an attorney or a legitimate legal services organization. In any event, an attorney needs to provide their bar number to receive control numbers. The control number system is the reasonable alternative that meets the legitimate interests of ODRC in preventing importation of contraband or other abuse of the legal mail system to discuss illegal schemes. The data shows that ODRC has successfully eliminated legal mail as a source of contraband. Furthermore, a cursory scan of legal mail, or even drug-sniffing dogs can detect illegal drugs and other contraband without such an invasion into the actual content of a letter from an attorney. Moreover, as discussed earlier, the policy of copying legal mail would arguably take significantly more time to implement, rather than taking the simple action of verifying a legitimate control number. If mail purportedly from an attorney seems suspicious, a simple phone call or email to the attorney can confirm whether the mail is legitimate. Thus, the Legal Mail Policy Variance is an "exaggerated response" that does not have a reasonable relationship to a legitimate penological interest. *See Turner,* 482 U.S. at 91.

In sum, all four *Turner* factors weigh in Plaintiff's favor, and so Plaintiff is likely to succeed on the merits of their challenge to the legal mail variance. When a constitutional violation is shown, there is "no issue as to the existence of the remaining preliminary injunction factors." *ACLU Fund of Mich.,* 796 F.3d at 649 (quoting from *Miller v. City of Cincinnati*, 622

F.3d 524, 540 (6th Cir. 2010)). Thus, this Court may grant the requested injunction on this basis alone.

**2. Plaintiff Has Suffered Irreparable Harm, and Absent a Preliminary Injunction, Irreparable Harm Will Continue to Occur.**

When the irreparable harm alleged is a violation of plaintiffs' constitutional rights, that violation is sufficient to show irreparable harm. *Planned Parenthood Sw. Ohio Region v. Hodges,* 138 F. Supp. 3d 948, 960 (S.D. Ohio 2015). As applied to Plaintiff OJPC's attorneys, the rights to a confidential attorney-client relationship, to communicate with incarcerated people, and to practice their profession have already been violated. With regards to OJPC's clients, the right to access the courts, the legal system, to communicate with attorneys, and to a confidential attorney-client relationship have been violated. The loss of First Amendment freedoms "unquestionably constitutes" irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Even "minimal infringement" constitutes irreparable injury. *Jones*, 569 F.3d at 277.

Moreover, each time a prison official reads a document sent by OJPC to a client or potential client, the attorney-client privilege is broken. The breaking of attorney-client privilege is an irreparable harm. *Hadix v. Johnson*, 871 F.2d 1087 (6th Cir. 1989). Therefore, this factor strongly favors granting a preliminary injunction.

**3. Granting the Injunction Will Cause No Harm to Others, and Will Merely Freeze the Status Quo as it Exists in Regards to Legal Mail at all other ODRC Institutions.**

The third factor to consider is whether granting injunctive relief on would cause substantial harm to others. *City of Pontiac Retired Emples. Ass'n.,* 751 F.3d at 430. Granting the requested relief would return the legal mail system at the eleven impacted institutions to the same process that continues to exist at all other ODRC institutions. In the meantime, ODRC will continue to process legal mail through the control number system to prevent conveyance of

20

contraband and other misuse of the legal mail system. Thus, ODRC's efforts to regulate legal mail will not be thwarted by the injunction. As discussed above, ODRC has already essentially eliminated legal mail as a source of contraband throughout the state prison system. Thus, incarcerated individuals and prison staff are unlikely to be harmed by granting the requested relief, as it would not increase access to drugs and other contraband. In fact, granting the requested relief would serve to protect their rights. Thus, this factor also weighs in favor of granting a preliminary injunction.

**4. Granting the Injunction is in the Public Interest.**

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998). The public as a whole has an interest in ensuring that the liberties guaranteed by the First Amendment are protected. *Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995). Additionally, the public interest will be served by protecting the attorney-client privilege. *See Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981) (observing that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.") Therefore, the public interest in protecting constitutional rights and the attorney-client privilege, which protects the public interest in the fair administration of justice, will be advanced by the granting of a preliminary injunction.

Based on the *Turner* factors enumerated above, the Legal Mail Policy Variance fails the *Turner* test, Plaintiffs have a high likelihood of success, and a preliminary injunction is warranted to prevent further harm to Plaintiff and its clients.

## III.    CONCLUSION

"[W]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Turner*, 482 U.S. at 84. The challenged Legal Mail Policy Variance offends OJPC's attorneys and incarcerated clients' constitutional rights to communicate confidentially about legal matters. This Court should grant a preliminary injunction prohibiting Defendants from implementing the Legal Mail Policy Variance.

Respectfully Submitted,

**/s/Mark A. Vander Laan**
Mark A. Vander Laan (0013297)
Trial Attorney for Plaintiff
Angela S. Larsen (0105189)
Lizett M. Schreiber (0084708)
Attorney for Plaintiff
Ohio Justice and Policy Center
215 E. 9th Street, Suite 601
Cincinnati, Ohio 45202
(513) 421-1108
(513) 562-3200 (fax)
mvanderlaan@ohiojpc.org
alarsen@ohiojpc.org
lschreiber@ohiojpc.org
Dated: June 6, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025 the foregoing was filed with the Court's

electronic filing system, and sent via electronic mail to: D. Chadd McKitrick,

Daniel.McKitrick@OhioAGO.gov

**/s/Mark A. Vander Laan**
Mark A. Vander Laan (0013297)