IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Ohio Justice and Policy Center, | : | |
| | : | Case No. 1:25-cv-00291 |
| Plaintiff, | : | |
| | : | |
| v. | : | Judge Cole |
| | : | |
| Annette Chambers Smith, *et al.*, | : | Magistrate Judge Bowman |
| | : | |
| Defendants. | : | |

---

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S AMENDED
MOTION FOR PRELIMINARY INJUNCTION [DOC. 19]**

---

NOW COME the named Defendants and hereby oppose the motion of Plaintiff Ohio Justice and Policy Center's Amended Motion for Preliminary Injunction. [Doc. 19]. For the reasons stated herein, the Court should deny Plaintiff's motion.

## I.      INTRODUCTION

Plaintiff Ohio Justice and Policy Center ("OJPC") filed an Amended and Supplemental Complaint against Defendants Annette Chambers-Smith, the Director of the Ohio Department of Rehabilitation and Correction ("ODRC"), and Cynthia Davis, George Fredrick, Doug Luneke, Bill Cool, Ryan Walters, Tim Shoop, Malcolm Heard, Aaron Mohr, Jenny Hildebrand, Erin Maldonado, and Michael Swartz, all wardens of correctional institutions under the purview of ODRC. [Doc. 23, PageID 604 – 606, ¶¶ 9 – 21]. OJPC seeks a declaratory judgment from the Court finding that a recently promulgated variance to ODRC's mail policy, ODRC Policy No. 75-MAL-03, "violates the First and Fourteenth Amendments of the [United States] Constitution as applied to OJPC attorneys and its incarcerated clients." [*Id.*, PageID 623, ¶ 143].

OJPC claims that its own rights under the First and Fourteenth Amendments include "the right to communicate with incarcerated people, the right to freedom of speech and expression, the right to practice their profession absent unreasonable government regulation, and the right to due process of law." [Doc. 23, ¶ 141]. OJPC further claims that its clients' have rights under the same Amendments that include "the right to communicate with the outside world, the right to access the courts and the legal system, the right to freedom of speech and expression, the right to petition the government for redress of grievances, and the right to due process of law." [*Id.*, PageID 142].

The variance to ODRC Policy No. 75-MAL-03 ("Legal Mail Variance"), in short, requires mailroom staff at ODRC correctional institutions to open legal mail in the presence of the intended incarcerated recipient, copy that opened mail using a copier with no memory capability that is only connected to an electrical supply, and hand-deliver a full and accurate copy of the legal mail to the incarcerated recipient before shredding the original legal mail. [Docs. 23-1, 23-2, and 23-3].

As established herein, the process under the Legal Mail Variance is less intrusive than having mailroom staff closely scrutinize the paper and ink on legal mail being handed to an incarcerated person with the possibility that it still contains illegal substances. [*See*, Affidavit of Fred Denney[1] ("Exhibit A"), ¶¶ 18 – 20 and 31 – 32]. Where there existed a possibility under the original policy of introducing legal mail being soaked with illegal substances, that possibility is thoroughly eliminated under the Legal Mail Variance. Elimination of this possibility occurs while the incarcerated population retains the possession of the confidential contents within legal mail. Under the Legal Mail Variance, mailroom staff also need only to take the amount of time necessary to copy and shred the original mail, while delivering the copy to the incarcerated person. [Exhibit A, ¶¶ 26 – 29, 31 – 32]. In contrast, under the original policy, mailroom staff required additional

---

[1] Mr. Denney's Affidavit is attached hereto as Exhibit A and is incorporated herein as if fully restated herein.

time to process legal mail as its contents required closer scrutiny under inspection of the paper and ink within the presence of the incarcerated person. [Exhibit A, ¶¶ 17 – 21]. Under the variance, prison officials no longer need to be concerned with whether or not the incarcerated population has possession of original legal materials that might be soaked with synthetic drugs or other illicit substances once it has been processed through the mailroom. [*Id.*, ¶ 33].

In its motion, OJPC seeks preliminary and permanent injunctive relief against all Defendants in their official capacities, forbidding them and their agents from implementing the Legal Mail Variance. As demonstrated in Defendants' motion to dismiss, and herein, there does not exist a substantial likelihood that OJPC will be successful in litigating this matter. While spending the majority of their memorandum in support discussing why it has a substantial likelihood of success with its claims, it offers no evidence to support that it will suffer irreparable harm should the Legal Mail Variance be permitted to continue while this matter is litigated. It also offers mere speculation that Defendants will suffer no harm should an injunction be granted. Finally, it is in the public interest for ODRC and Defendants to ensure that Ohio's correctional institutions, the incarcerated population and correctional staff are free from illegal substances and the resulting dangerous situations from their use.

The standard for obtaining injunctive relief does not favor OJPC, and as a result, the Court should deny OJPC's amended motion for a preliminary injunction.

## II. STATEMENT OF FACTS

As of December 2, 2024, a Legal Mail Variance was implemented at Southern Ohio Correctional Facility ("SOCF"), Marion Correctional Institution ("MCI"), and Lebanon Correctional Institution ("LeCI"). [Doc. 23, PageID 608, ¶ 32; Doc. 23-2]. The Legal Mail Variance was expanded to Ross Correctional Institution on April 2, 2025. [Doc. 23, PageID 608,

¶ 32; Doc. 23-3]. On June 1, 2025, the Legal Mail Variance was extended both in length of time and to other ODRC correctional institutions including Allen-Oakwood Correctional Institution ("AOCI"), Chillicothe Correctional Institution ("CCI"), Franklin Medical Center ("FMC"), Mansfield Correctional Institution ("ManCI"), Ohio Reformatory for Women ("ORW"), and Toledo Correctional Institution ("ToCI"). [Doc. 23, PageID 608, ¶ 34; Doc. 23-1].

The Legal Mail Variance calls for mailroom staff to perform the following acts when legal mail intended for an incarcerated person is delivered to a correctional institution: [Doc. 23-1]

1. Legal mail will be opened in the presence of the Incarcerated Person by a mailroom staff member or warden's designee in the designated legal mail area.

* * *

3. If the legal mail does not appear suspicious, or does not need further investigation, a designated staff member will proceed as follows:

   i. The staff member will copy the document in the presence of the Incarcerated Person using the designated legal mail copier with no memory capability and allow the Incarcerated Person to review the copy to ensure it contains the same number of pages as the original document.

   ii. If the Incarcerated Person acknowledges that the copy contains the correct number of pages and is legible, the Incarcerated Person shall sign the Legal Mail Log (DRC2632) acknowledging that they were shown the original legal mail [and] took possession of the copy. No additional copies will be made.

   iii. Once the Incarcerated Person accepts the copy, the original document will be shredded in the presence of the Incarcerated Person using the designated legal mail shredding equipment.

   iv. If the Incarcerated Person disputes that the copy matches the original, staff will check to see if an error was made, and if so, correct it.

   v. If the Incarcerated Person refuses to sign and acknowledge accepting the copy of the legal mail after any corrections have been made, the copy shall be shredded, and the original legal mail confiscated. The confiscated legal mail shall be returned to sender with "refused to accept delivery" placed on the outside of the envelope.

At no time does the Legal Mail Variance allow mailroom staff or a warden's designee to *read* an Incarcerated Person's confidential legal mail. [Doc. 23-1]. Reading an incarcerated person's legal mail subjects them to disciplinary action. [Exhibit A, ¶ 30].

Despite this fact, OJPC suggestively infers that the Legal Mail Variance allows mailroom staff and other prison officials "many opportunities to read confidential legal mail," using the statements of one of their own investigators. [Doc. 23, PageID 603, ¶ 2].

Susan Shellenberger is OJPC's investigator who witnessed the legal mail process under the Variance in person. [Doc. 23-4]. After describing what she observed, Ms. Shellenberger provides her general beliefs as to what she believes could possibly happen. In other words, she offers her own conjecture and speculation. Interestingly, Ms. Shellenberger never states she witnessed mailroom staff or other prison officials in fact *reading* an incarcerated person's legal mail during her observation. [Doc. 23-4]. Instead, Ms. Shellenberger only opined that she "*believe[d]* that mailroom staff at [LeCI] are reading legal mail during the process of copying and shredding." (emphasis supplied). [Doc. 23-4, PageID 639, ¶ 46]. Ms. Shellenberger based her speculative belief on the mere fact that she observed that the process "took several minutes to accomplish." [Doc. 23-4, PageID 639, ¶ 46]. Ms. Shellenberger also based her belief on a hypothetical, with no objective factual support, stating "This reading occurs as a natural result of frequently laying eyes on the mail for several *seconds* at a time, looking at individual pages as they are being copied or shredded, looking at pages to fix paper jams, fanning out pages, flipping through pages, and sometimes looking at each individual page with an incarcerated person as they compare the copies and originals." (emphasis supplied). [*Id.*, PageID 639-40, ¶ 46]. Ms. Schellenberger also did not reference any objective study or other evidence to support her speculative beliefs.

The credibility in Ms. Shellenberger's beliefs is inherently flawed. While she expressed concerns about the length of time that it took for mailroom staff to process legal mail under the Legal Mail Variance, Ms. Shellenberger based her belief using no baseline information or data for comparison. This baseline information is necessary to draw any logical conclusion as to whether or not the legal mail processing under the Variance is indeed more efficient or intrusive.

The evidence will show that the Legal Mail Variance works to better benefit both prison officials *and* incarcerated persons. [*See*, Exhibit A]. First, the Legal Mail Variance benefits the incarcerated population because mailroom staff and prison officials do not need to engage in such a rigorous review or inspection of the paper and ink as they were required to perform before under the original mail policy. [*Compare* Exhibit A, ¶¶ 18 – 20 *with* ¶¶ 24 – 29]. Instead, mailroom staff only need to review the legal mail for enough time to ensure that the pages will (1) copy properly and not jam in the copier and (2) shred properly, both to the satisfaction of the incarcerated recipient. [*Id.*, ¶¶ 24 – 29].

The Legal Mail Variance has greatly reduced the amount of time and resources it takes to process legal mail. [*Id.*, ¶¶ 31 – 32]. Mailroom staff have seventy-two hours (72) to process legal mail. Prior to the new Legal Mail Variance, prison officials and mailroom staff often encountered difficulties meeting this deadline because they needed additional security measures to detect contraband. These additional security measures included inspection of individual pages, the use of special lamps and technology, and the use of drug sniffing dogs. [Exhibit A, ¶¶ 18 – 20]. The prior difficulties in meeting this deadline have now been greatly reduced in those institutions implementing the legal mail process under the Variance. [*Id.*, ¶ 32]. This reduction in time inherently benefits the incarcerated population, since they are able to access their legal mail in a more efficient and timely manner.

6

From a larger perspective, prison officials also no longer need to be concerned that the incarcerated population are receiving legal materials soaked with illegal drugs. [*Id.*, ¶ 33]. The Legal Mail Variance essentially ensures the incarcerated population will have access to only drug-free paper for their legal materials.

It takes only one sheet of paper soaked with illegal drugs to cause unnecessary harm to the incarcerated population and ODRC. [*Id.*, ¶¶ 7 - 10]. The monetary value of one piece of paper soaked with illegal drugs further subjects the incarcerated population to the risk of additional significant harms. [*Id.*, ¶ 10]. Incarcerated persons who engage in the sale and trade of illegal substances are subject to threats of violence and extortion by other incarcerated persons. More importantly, one sheet of paper containing illegal drugs is enough to cause the overdose of the entire incarcerated population in one institution alone. [*Id.*, ¶ 7]. Prison officials have a constitutional duty and responsibility to protect the health and safety of all incarcerated persons, and to prevent drug use, overdose, or possible death resulting from overdose. Should prison officials fail in adhering to their responsibilities, they subject themselves, and the State of Ohio to liability and the potential for the payment of compensatory and punitive damages.

While OJPC correctly acknowledged ODRC has successfully engaged in multiple efforts to prevent the conveyance of contraband into its prisons, it conceded within its amended pleading that contraband continues to be introduced into Ohio's prisons through abuse of the legal mail system. [Doc. 23, PageID 615, ¶ 90]. The landscape of types contraband and the methods used to convey contraband into correctional facilities is dynamic. It is necessary for Defendants to remain vigilant of the ever-changing tactics used to smuggle contraband into correctional institutions. [Exhibit A, ¶ 4]. The Legal Mail Variance is merely another tool for use in this battle.

OJPC further contends ODRC's "Original Legal Mail Policy," implemented through ODRC Policy No. 75-MAL-03 was a much less invasive process than the Legal Mail Variance at issue. [Doc. 23, PageID 617]. However, OJPC's opinion about the level of invasiveness under the Legal Mail Variance is based on its mischaracterization of how legal mail is processed under the Original Legal Mail Policy. The Original Legal Mail Policy required that attorneys first obtain a control number that must be verified by prison officials when sending legal mail to their incarcerated clients. [Doc. 23, PageID 613, ¶ 74]. While OJPC correctly explained that the Original Legal Mail Policy mandated legal mail could not be read and copied, OJPC intentionally minimized the level of prison officials' handling of legal mail under the Original Legal Mail Policy, alleging "it would only take a few seconds to open an envelope and remove the letter from the envelope." [*Id.*, PageID 616, ¶ 97].

It is undisputed that Ohio Adm.Code 5120-9-17(B)(2) allows legal mail to "be *opened and inspected for contraband* only in the presence of the inmate-addressee." (emphasis supplied). Overwhelming federal case authority, cited herein, further allows the opening *and inspection* of legal mail in the presence of incarcerated persons. Thus, legal mail is permitted the same level of inspection and handling by prison officials under the Original Legal Mail Policy as it is under the Legal Mail Variance at issue, if not additional scrutiny.

OJPC finally contended that it and its clients will be irreparably harmed with implementing the Legal Mail Variance. For instance, OJPC alleged that it risks having their "clients' confidences" be exposed by mailing confidential information to its clients. [Doc. 23, PageID 620, ¶ 119]. However, OJPC has provided no evidence whatsoever that its clients' confidences have been exposed, let alone used against OJPC or its clients, in any manner.

OJPC further alleged that by merely sending confidential legal mail to its clients, it "break[s] the attorney-client privilege, and plac[es] their attorneys at risk of discipline." [*Id.*, PageID 620, ¶ 123]. However, this allegation is conclusive and not supported by fact, since OJPC never alleged that it has been sued for professional negligence or that a disciplinary complaint has been filed against it or any of its attorneys.

OJPC further concluded, without pointing to specific examples, that the Legal Mail Variance "prevents attorneys from communicating privately with their clients, thereby impairing an incarcerated person's right to seek legal assistance and otherwise communicate with the outside world." [*Id.*, PageID 622, ¶ 138]. While OJPC alleged that it is "specifically deterred from sending legal mail surrounding sensitive matters," it did not allege that it has stopped sending legal mail, or communicating otherwise, with its incarcerated clients. [*Id.*, PageID 620, ¶ 120]. Nor is there evidence that OJPC's clients, whether current or prospective, have been deterred from communicating with OJPC or the outside world.

## III.    LAW AND ARGUMENT

### A.  Requirements under Fed. R. Civ. P. 65.

Under Fed. R. Civ. P. 65, the Court must apply a four-factor test to determine whether to grant a plaintiff's request for an injunction. In so doing, the Court must consider: 1) whether the party seeking the order has shown a strong likelihood of success on the merits; 2) whether the moving party will suffer irreparable harm if the injunction does not issue; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuance of the injunction. *Third Party Solutions, Inc. v. Express Scripts, Inc.,* 298 F. App'x. 402, 403 (6th Cir. 2008).

An injunction is an extraordinary remedy which should be granted only if the movant carries the burden of proving the circumstances clearly demand it. *Jones v. Caruso,* 569 F.3d 258, 265 (6th Cir. 2009). Thus, a finding that there is no likelihood of success on the merits is usually fatal. *Gonzalez v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000); *NAACP v. Mansfield,* 866 F.2d 162, 167 (6th Cir. 1989) (plaintiff's initial burden in demonstrating entitlement to injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 claims).

Compounding OJPC's burden in this case, the PLRA imposes additional restrictions on an inmate's request for injunctive relief. Indeed, where an incarcerated individual seeks an order enjoining a prison official, a court is required to proceed with the utmost care and must be cognizant of the unique nature of the prison setting. *Kendrick v. Bland,* 740 F.2d 432, 438, n. 3 (6th Cir. 1984).

Here, OJPC cannot satisfy its burden of demonstrating there is a substantial likelihood it will be successful on the merits of its claims. Furthermore, OJPC has produced no evidence to support its contentions that it will be irreparably harmed should injunctive relief not be issued. Nor has OJPC shown that the Defendants will not be substantially harmed if the injunction is granted. Finally, OJPC cannot demonstrate that it is in the public's interest for a preliminary injunction to be granted.

**1. OJPC cannot demonstrate a substantial likelihood it will be successful on the merits of this action.**

Before considering whether to grant injunctive relief, the Court must first determine whether it has subject matter jurisdiction due to OJPC's lack of standing to bring this action. Defendants have challenged OJPC's standing to bring this action because it has not alleged concrete and particularized injuries in fact that are actual or imminent. Defendants incorporate all

the facts and arguments stated within their motion to dismiss and its supporting memorandum as one of the principal bases for why OJPC cannot establish a substantial likelihood of success of winning on the merits of this action. As shown below, OJPC cannot satisfy this factor because the evidence supports that Defendants' Legal Mail Variance is reasonably related to a penological interest under the *Turner* test.

### a. The Legal Mail Variance satisfies muster under the *Turner* test.

In opening an incarcerated person's legal mail in their presence, copying and shredding the original, and providing a complete copy to the incarcerated person, Defendants assert that the Legal Mail Variance appropriately imposes reasonable restrictions related to security and other legitimate penological objectives. The implementation has shown a clear benefit by eliminating any chance of drug-soaked paper entering into the affected institutions.

Utilizing the two-step test set forth in *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, (1987), the Court must determine whether or not the Legal Mail Variance is reasonably related to legitimate penological interests." *Id.* If the answer to that is "Yes," then ultimately the Variance passes constitutional muster and this motion should be denied. *Id.*

First, Defendants must demonstrate a valid, rational connection between the prison regulation and the legitimate interest put forth to justify it. If that connection exists, then under the second step, the court must determine whether (i) whether inmates have an alternative means of exercising the right; (ii) the burden on prison resources that would be imposed by accommodating the right; and (iii) whether there are alternatives to the regulation that fully accommodate the inmate's rights at *de minimis* cost to valid penological objectives. *Id.* Importantly, the *Turner* test does not require prisons to use the least restrictive means possible to further legitimate penological interests. *Id*.

### i. Rational Connection:

Prison walls do not form a barrier separating prison inmates from the protections of the Constitution; however, the Supreme Court recognizes that "these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration. *Thornburgh v. Abbott*, 490 U.S. 401, 407 (citing *Turner*, 482 U.S. at 85). An incarcerated person's right to receive mail is protected by the First Amendment, but prison officials may impose restrictions that are reasonably related to security or other legitimate penological objectives. *See Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992). "[W]e have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547(1979). The Sixth Circuit has noted, "prison officials may open prisoners' incoming mail pursuant to a uniform and evenly applied policy with an eye to maintaining prison security." *Lavado v. Keohane*, 992 F.2d 601, 607 (6th Cir. 1993). Prison officials who open and read incoming mail in an arbitrary and capricious fashion violate a prisoner's First Amendment rights. *See Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986). OJPC acknowledges there is nothing arbitrary or capricious as it relates to the Legal Mail Variance itself but speculates that confidential legal communications bear the risk of being read during the handling process.

This Court has previously held that "[p]ermissible restrictions include opening a prisoner's mail, so long as it is done 'pursuant to a uniform and evenly applied policy with an eye to maintain prison security.'" *Stone*, 2023 U.S. Dist. LEXIS 5690, *26 - *27 (quoting *Sallier*, 343 F.3d at 873 in turn quoting *Lavado*, 992 F.2d at 607).

Under the Legal Mail Variance, mailroom staff and prison officials are permitted to open legal mail, inspect it, make a copy of the original, shred the original, and deliver the copy to the incarcerated person, but all of these acts must occur within the presence of the incarcerated person and to their complete satisfaction. [Doc. 23-1]. Furthermore, at no point does the Legal Mail Variance permit mailroom staff or prison officials to read the contents of the legal mail. Doing so would result in potential disciplinary action. [Exhibit A, ¶ 30]. As such, the Legal Mail Policy adheres to the mandate of the Sixth Circuit under *Sallier*. The Legal Mail Variance undoubtedly is rationally connected to its duty and obligation to prevent the smuggling of illegal drugs and other contraband into Ohio's correctional institutions.

This Court has previously found no constitutional violation when legal mail has been copied and the copy has been delivered to the incarcerated person. *Stone*, 2023 U.S. Dist. LEXIS 5690, *30. In *Stone*, the Court was tasked with determining whether an incarcerated person's First Amendment rights were violated when the defendant confiscated original legal mail that appeared suspicious after making photocopies of the same and delivering the photocopies to the incarcerated person. The photocopying occurred under the Original Legal Mail Policy, which prohibited the copying of the contents of legal mail. [Doc. 23, PageID 614, ¶ 77]. Despite the defendant's violation of the Original Legal Mail Policy, the Court held that the incarcerated plaintiff never made allegations "suggesting how [the photocopying] infringed upon his relationship with his attorney or his access to the courts." *Stone*, 2023 U.S. Dist. LEXIS 5690, *29. Nor did the incarcerated plaintiff allege that the defendant actually read his legal mail. *Id.* at *30. In finding the defendant did not engage in a constitutional violation, the Court cited to *Bray v. Mazza*, No. 4:21-cv-119, 2022 U.S. Dist. LEXIS 229551, 2022 WL 17836601 (W.D. Ky. Dec. 21, 2022) ("holding a Kentucky prison policy of photocopying legal mail and destroying original mail to

keep contraband from reaching inmates constitutionally permissible."). *Id.* The Kentucky prison policy of opening, copying, and shredding is similar to the policy set forth under the Legal Mail Variance.

In *Bray*, the Western District of Kentucky applied the *Turner* test to determine whether Kentucky's Legal Mail Policy was reasonably related to a legitimate penological interest. After applying the *Turner* factors, the court found that the defendant's "opening, copying, providing the inmate a photocopy of the legal mail, and withholding or discarding the original legal mail" in accordance with Kentucky policy were related to a legitimate penological interest. *Bray*, 2022 U.S. Dist. LEXIS 229551, *10 - *11. The Westen District of Kentucky also upheld the same open, copy, shred practice as constitutional in *Johnson v. Briarly*, No. 3:22-cv-153, 2023 U.S. Dist. LEXIS 127973, 2023 WL 4747688 (W.D. Ky. July 25, 2023). More specifically, the Western District of Kentucky found that "photocopies allowed [the plaintiff] to read every word of his mail, and not allowing inmates to handle the original mail is reasonably related to [the prison's] legitimate penological interest in preventing contraband from being smuggled in." *Johnson*, 2023 U.S. Dist. LEXIS 127973 at *7. The Eastern District of Virginia has also upheld the constitutionality of a similar open, copy, shred policy in *Wright v. Wilson*, No. 3:23-cv-746, 2024 U.S. Dist. LEXIS 198618, *10 - *12, 2024 WL 4648097 (E.D. Va. Oct. 31, 2024). *See also*, *Parker v. Itodo*, No. 3:22-cv-830, 2023 U.S. Dist. LEXIS 46788, 2023 WL 2571686 (N.D. Ind. Mar. 20, 2023) (finding that fears that a legal claim may be harmed in the future is speculation that isn't enough to proceed beyond a motion to dismiss).

Thus, there is overwhelming authority that establishes the process implemented under the Legal Mail Variance is constitutionally sound as it is reasonably related to a penological interest.

   ii. ***Turner's*** **second step: (i)There are no alternative means of meeting the legitimate penological interests; (ii) failure to utilize the mail policy will produce a detrimental ripple effect; and (iii) Plaintiff cannot provide an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests**

There are three factors that the court must consider under the second step of *Turner*.

   a. **Alternative means continue to exist for incarcerated persons to communicate confidentially with OJPC.**

First, "[w]ere it shown that no alternative means of [exercising the circumscribed right] existed. . . it would be some evidence that the regulations were unreasonable." *Overton v. Bazzetta,* 539 U.S. 126, 135. In the instant matter, OJPC acknowledged that correctional institutions provide a means for incarcerated persons to communicate confidentially with their counsel using either in-person visits and through a telephone "whitelisting" function available on the computer tablets issued to each prisoner. "Whitelisting" is an option for a confidential, unrecorded telephone call between an attorney and an incarcerated person offered by ODRC at no cost to the users. Despite this acknowledgment, OJPC contended that (1) it is too cumbersome for their attorneys and staff to visit clients and (2) telephone calls are often inadequate means of communication for things like reviewing pleadings or other written documents.

OJPC additionally suggested that the whitelisting option is unacceptable because their clients often communicate to OJPC attorneys and staff while in the presence of other incarcerated persons and prison officials. OJPC suggests that the whitelisting option also breaks the attorney-client privilege in the same manner as the processing of legal mail under the Legal Mail Variance. OJPC's basis for this suggestion is there exists a potential for exposure to a confidential legal communication similar to that of the legal mail processing under the Variance. Yet, OJPC never challenged the constitutionality of ODRC's offering of the whitelisting communication option, thereby conceding that it passes constitutional muster. Because OJPC does not challenge the

constitutionality of the whitelisting option, it is illogical for it to challenge the constitutionality of the Legal Mail Variance for the same speculative reasoning.

> **b. Barring the Legal Mail Variance will cause a detrimental ripple effect.**

Second, the Court must consider the impact that accommodation of the asserted right would have on guards, other inmates, the allocation of prison resources, and the safety of visitors. *See Turner*, 482 U.S., at 90. The court "should be particularly deferential to the informed discretion of corrections officials" when an accommodation "will have a significant 'ripple effect' on fellow inmates or on prison staff." *Turner*, 482 U.S. at 90. "[J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell v. Wolfish*, 441 U.S. 520, 548 (1979).

The Legal Mail Variance effectively eliminates the possibility of the introduction of drug soaked paper reaching the incarcerated population through the abuse of the legal mail system. As demonstrated in the evidence before the Court, the Legal Mail Variance allows corrections officers and prison officials to spend more time addressing prison safety and security issues and less time addressing the delivery of mail and the search for contraband smuggled through the mail. [*See*, Exhibit A]. Legal materials will be subject to continued scrutiny and inspection during mandatory random cell searches. Not enforcing the policy would cause an additional negative ripple effect on other inmates and prison staff by returning to ineffective contraband detection methods, creating increased time spent by staff searching for contraband potentially contained in the individual pages of legal mail. It is far more beneficial for the incarcerated population to have their legal mail processed and delivered safely under the Legal Mail Variance.

### c. The smuggling of contraband through the abuse of the legal mail system continues despite the use of other alternative methods.

Third, OJPC has failed to "point to an alternative that *fully* accommodates the prisoner's rights at *de minimis* cost to valid penological interests." (emphasis supplied) *Turner*, 482 U.S. at 91. Although OJPC is correct in stating the use of control numbers has greatly reduced the number of contraband being introduced into Ohio's correctional institutions, OJPC has not demonstrated this method alone has fully stopped the introduction of contraband through the abuse of the legal mail system. The smuggling of contraband into correctional institutions is an ever-changing phenomenon that requires prison officials to continuously develop and improve methods to counteract new means of smuggling contraband. [Exhibit A, ¶ 4]. The Legal Mail Variance allows Defendants to again address the changes made in smuggling through a means that has passed Constitutional muster in this Court and others as well.

Because the Legal Mail Variance is not unconstitutional, it does not infringe upon OJPC's First Amendment rights regarding legal mail. Therefore, OJPC cannot demonstrate that it has a substantial likelihood of succeeding on its claims.

### B. OJPC cannot demonstrate it has a substantial likelihood of succeeding in its Fourteenth Amendment claims.

The Fourteenth Amendment prohibits states from depriving people of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The due process clause has both procedural and substantive components." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). A procedural due process claim requires a plaintiff to show (1) a life, liberty, or property interest protected under the Fourteenth Amendment, (2) the deprivation of a protected interest, and (3) the state's denial of adequate procedural rights before depriving a person of their protected interest. *Wedgewood Ltd. P'ship I v. Township of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010).

Here, the Fourteenth Amendment affords incarcerated persons the right to have meaningful access to the courts so they can litigate their cases. *Johnson*, 2023 U.S. Dist. LEXIS 127973, *9 (citing *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Ross v. Moffit*, 417 U.S. 600, 611 (1974)). But again, to have standing to bring this claim, a plaintiff must "show that he suffered prejudice to his right of access to the court." *Johnson*, 2023 U.S. Dist. LEXIS 127973, *9 (quoting *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) in turn citing *Lewis*, 518 U.S. at 351). Here, OJPC must allege they suffered a "relevant actual injury" and demonstrate how the Legal Mail Variance "hindered OJPC's clients from pursuing their legal claims." *Id.* (quoting *Lewis*, 518 U.S. at 351). Because OJPC did not allege such an injury, it cannot succeed on a procedural due process claim.

To succeed on a substantive due process claim, a plaintiff must allege facts showing that "arbitrary and capricious government action deprived [the plaintiff] of a constitutionally protected interest" or that the defendants' conduct "shocks the conscience" of a reasonable, ordinary person. *Warren v. City of Athens*, 411 F.3d 697, 707 (6th Cir. 2005); *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 1990). Here, OJPC neither alleged any arbitrary or capricious conduct of Defendants or that Defendants' conduct shocks the conscience of a reasonable, ordinary person, and therefore, OJPC further failed to allege a substantive due process claim. As such, OJPC's Fourteenth Amendment claims should be dismissed.

### 2. OJPC will not suffer irreparable harm should the injunction not be granted.

Without alleging concrete and particularized examples, OJPC claims it, and its attorneys, have been injured by the implementation of the Legal Mail Variance. First, OJPC alleged that it "risks" having its "clients' confidences" being exposed by mailing confidential information to its clients. [Doc. 23, PageID 620, ¶ 119]. OJPC further alleged that by merely sending confidential legal mail to its clients, it "break[s] the attorney-client privilege, and plac[es] their attorneys at risk

of discipline." [*Id.*, PageID 620, ¶ 123]. However, this speculative allegation is not supported by any evidence before the Court. There is no evidence OJPC has been sued for professional negligence by one of its clients for having mail subject to the Legal Mail Variance. Nor is there any evidence that a disciplinary complaint has been filed against OJPC or any of its attorneys as a result of its legal mail being subject to the Legal Mail Variance.

OJPC further concluded, without pointing to specific examples, that the Legal Mail Variance "prevents attorneys from communicating privately with their clients, thereby impairing an incarcerated person's right to seek legal assistance and otherwise communicate with the outside world." [*Id.*, PageID 622, ¶ 138]. There is no evidence to support any contention that OJPC has been barred or prevented from communicating privately with their clients by prison officials. Nor is there evidence to support their conclusion that an incarcerated person's right to seek legal assistance and otherwise communicate with the outside world has actually been hindered.

OJPC's allegation that it is deterred from sending legal communications to its incarcerated clients is simply conjecture. There is no evidence OJPC stopped sending legal communications to its incarcerated clients or vice versa.

Finally, although OJPC claimed it has the right to freedom of speech and expression, the right to practice their profession absent unreasonable government regulation, and the right to due process of law, there is no evidence before the Court to support that OJPC or its clients were injured as a result of any alleged violation of these rights. There is no evidence that OJPC has been wholesale-barred from engaging in speech or other communications with incarcerated persons. Nor is there any evidence demonstrating OJPC's right to practice their profession has been hindered in any manner due to the Legal Mail Variance.

Ultimately, the Legal Mail Variance allows OJPC and other attorneys to confidentially communicate with their clients very similarly to the way they did under the Original Legal Mail Policy and OJPC has not alleged facts sufficient to show that they would succeed on the merits of its claims in this case.

> **3. Prison officials and other incarcerated persons will likely suffer substantial harm and the public interest will not be served should the Court grant OJPC a preliminary injunction.**

As the evidence shows, it takes only one single piece of paper soaked with drugs to cause significant harm to both incarcerated persons and ODRC staff. [Exhibit A, ¶ 7]. By issuing injunctive relief, the Court will eliminate the one true method of preventing drug-soaked paper from entering Ohio's correctional institutions through abuse of the legal mail system. OJPC concedes that individuals continue to abuse the legal mail system by enclosing contraband within legal mail. Should any incarcerated person suffer harm, an overdose, or possibly death, as a result of drugs smuggled through the legal mail, Defendants and ODRC would face significant liability and costs. In turn, it is in the public's interest for ODRC to continue to take multiple and updated measures to counteract the smuggling of drugs into Ohio's correctional institutions and keep staff and incarcerated persons safe.

## IV.    CONCLUSION

The Court should deny OJPC's motion for a preliminary injunction. OJPC has not demonstrated that it can satisfy any of the elements required for obtaining injunctive relief. Of note, OJPC cannot demonstrate that it has a substantial likelihood of succeeding on the merits of this claim. Furthermore, there is no evidence to support OJPC will suffer irreparable harm should injunctive relief not be issued. Finally, OJPC has not demonstrated that ODRC and others will not be harmed or that it is in the public interest to grant injunctive relief.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*s/ D. Chadd McKitrick*
D. CHADD MCKITRICK (0073750)
Senior Assistant Attorney General
Criminal Justice Section
Corrections Litigation Unit
30 E. Broad Street, 23rd Floor
Columbus, Ohio 43215
P: (614) 644-7661/F: (866) 359-3383
Daniel.McKitrick@OhioAGO.gov

*Trial Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing *Defendants' Memorandum in Opposition of Plaintiff's Motion for Preliminary Injunction* was electronically filed on June 30, 2025. Notice of this filing will be sent to counsel for all parties via the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ D. Chadd McKitrick*
D. CHADD MCKITRICK (0073750)
Senior Assistant Attorney General