**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **Ohio Justice and Policy Center,** | : | |
| | : | **Case No. 1:25-cv-00291** |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Judge Cole** |
| | : | |
| **Annette Chambers Smith, *et al.*,** | : | **Magistrate Judge Bowman** |
| | : | |
| **Defendants.** | : | |

---

**AFFIDAVIT OF FRED DENNEY**

---

I, Fred Denney, pursuant to 28 U.S.C. 1746, make this unsworn declaration, under the penalty of

perjury and declare that the statements made below are true:

1. I have personal knowledge of the information set forth in this unsworn declaration, and I am competent to testify as to the matters stated herein.

2. I am currently employed by the Ohio Department of Rehabilitation and Correction ("ODRC") as a Correctional Warden's Analyst at the Southern Ohio Correctional Facility ("SOCF"). I have twenty-five (25) years of experience in the area of corrections, of which the last six (6) years I have been employed as a the assistant investigator and the investigator at SOCF.

3. As part of my job duties as an investigator at SOCF, I serve as a liaison between the Ohio State Highway Patrol and SOCF, whose duties include investigating and determining methods the incarcerated population at SOCF obtain contraband in the form of illicit or illegal substances.

4. As with any correctional institution within the State of Ohio, drug abuse amongst the incarcerated population is prevalent at SOCF, and it is important to remain vigilant in preventing the introduction of contraband and illegal drugs into SOCF.

5. Some of the more prevalent illegal substances found amongst, and consumed by, the incarcerated population at SOCF and other Ohio correctional institutions include marijuana, opioids, and synthetic narcotics such as K2, K3, and bug spray.

6. One of the more prevalent means of smuggling synthetic illegal substances such as K2, K3, and bug spray in the past decade has been through the soaking of paper with the synthetic

illegal substance and mailing the "soaked" paper into SOCF and other correctional institutions.

7. A single sheet of standard, 8.5" x 11", letter-sized paper "soaked" with enough illegal substances has the possibility of causing the entire incarcerated population at SOCF to overdose on the illegal substance.

8. Paper "soaked" with illegal substances has the ability to harm any individual that comes into contact with the same, and it puts the lives of the incarcerated population and staff members at SOCF in danger.

9. Incarcerated persons who receive papers "soaked" with illegal drugs through mail will sell the "soaked" paper to other incarcerated persons in either full sheets, cut-up strips, or cut-up squares varying in size and for varying values to other prisoners.

10. A single sheet of standard, 8.5" x 11", letter-sized paper "soaked" with illegal substances can possibly have a "prison" value between $4,000.00 to $59,000.00, depending on the illegal substance soaked on the single sheet of paper.

11. In 2021, ODRC began to revise its policies and practices in processing both regular mail and legal mail being delivered to the incarcerated population, including ODRC Policy Nos. 75-MAL-01, pertaining to incarceration population mail, and 75-MAL-03, pertaining to incarcerated population legal mail.

12. Ultimately, to combat the smuggling of "soaked" paper in regular mail being sent to the incarcerated population, ODRC now requires that all mail sent to the incarcerated person at most prisons be sent to a mail processing center that scans and uploads an electronic copy of the mail onto a computer tablet issued to each incarcerated person. The incarcerated person can then open the electronic copy of the regular mail on their tablet and review the same. SOCF is one of a few institutions that is still photocopying mail. At SOCF, the mail is opened and photocopied before being given to the incarcerated person.

13. As for legal mail being delivered to the incarcerated population, ODRC implemented a policy and practice that required attorneys and law firms to register for the ability to obtain a "control number" for legal mail sent to an incarcerated person.

14. This process first allowed ODRC to verify that it was truly attorneys and law firms that were sending confidential communications to the incarcerated population as opposed to persons impersonating legal counsel for the purpose of smuggling in contraband.

15. This process also allowed ODRC to verify that those pieces of legal mail sent by attorneys and law firms and assigned a "control number" were in fact being sent by those attorneys and law firms registered with ODRC to send confidential legal communications and not by those persons impersonating legal counsel.

16. By implementing these policies and practices relating to mail being sent to the incarcerated population, ODRC was able to greatly reduce the number of instances where paper "soaked" with illegal drugs were smuggled into SOCF and other ODRC institutions.

17. Despite the significant reduction in the number of contraband being smuggled through the use of both regular and legal mail, there remain isolated instances where prison officials continued to intercept illegal substances attempted to be smuggled into SOCF and other ODRC institutions through the use of legal mail.

18. As a result of these instances, prison officials at SOCF and other ODRC institutions were required to place all incoming legal mail through rigorous inspection and scrutiny. This involved visually inspecting each page of all legal documents sent to incarcerated persons to determine whether there existed any irregularities in the paper or ink that would indicate the page was "soaked" with any illegal substance.

19. Sometimes this involved looking at the individual pieces of paper using special lamps and technology to determine the consistency of the paper itself.

20. This additional scrutiny required having specially trained dogs to inspect legal mail to see if they would detect any foreign substance.

21. This additional scrutiny of incoming legal mail made it logistically difficult for mailroom staff at SOCF and other ODRC institutions to process and deliver legal mail to incarcerated persons within seventy-two (72) hours of its delivery to the institution, as required under ODRC 75-MAL-03.

22. Prison officials at SOCF and other ODRC institutions continued to experience situations where incarcerated persons had overdosed after having consumed "soaked" paper. Prison officials at SOCF and other ODRC institutions additionally had to engage in continued scrutiny and inspection of property and legal materials belonging to incarcerated persons during cell searches.

23. In December 2024, ODRC implemented a temporary variance to its legal mail policy to address the challenges prison officials continued to face in processing legal mail even with the use of control numbers.

24. The new ODRC variance required mailroom staff at SOCF and other ODRC institutions to: (1) open all legal mail that contained a control number and determine no further contraband exists within the legal mail, (2) copy the legal mail, (3) allow the incarcerated person to review the copy made of the original legal mail to ensure it was properly copied, and (4) shred the original copy of the legal mail. All of these acts are required to take place in the presence of the incarcerated person.

25. The legal mail is copied using a copier that has no memory storage capacity and is only connected to an electrical supply line. The original legal mail is shredded using a shredder that uses a cross-cut shredding pattern.

26. At SOCF, the copiers are located in a secured office in each of the five (5) housing units. Once an incarcerated person receives legal mail, a mail clerk will take the unopened envelope containing the legal mail to the housing unit where the incarcerated person is housed. The incarcerated person will be escorted to the secure room where the mail clerk is present. The mail clerk will then open the envelope containing the legal mail in front of the incarcerated person to whom the legal mail is addressed. The escorting officer remains present for security purposes at SOCF, one of three maximum security prisons in Ohio. The escorting officer does not observe or participate in the legal mail processing.

27. Once the envelope containing the legal mail is opened, the mail clerk will fan through the papers to ensure that the document does not jam while it is copied and also to ensure there is no other contraband enclosed within the pages of the legal mail. The mail clerk will then copy the document. The incarcerated person is permitted to inspect each copied page and determine there is no error in the copy. The legal mail is not shredded until the incarcerated person confirms that he is satisfied that the copy of the legal mail is proper and complete.

28. While the mail clerk performs these acts, the incarcerated person is physically present and fully able to witness and view the mail clerk's actions.

29. Once the mail clerk finishes copying the document, he shreds the legal mail using a shredder located on a cart that is handled by the mail clerk. The legal mail is shredded several pages at a time using the cross-cut shredding. The cross-cut, shredded paper is collected within the bin attached to the shredder. Once the mail clerk has finished processing all of the legal mail within a single housing unit, the bin containing the shredded paper is moved and placed within a "hot" trash bin located in the central mailroom. No unescorted incarcerated person is permitted in the mailroom at any time. A "hot" trash bin is a locked and controlled trash bin that is only accessed by a very limited number of prison staff and waste management entities.

30. Mail clerks who process legal mail under the variance are instructed not to read the legal mail, and they are trained and instructed to only process the legal mail under the variance as described. If it were determined that any mail clerk was reading an incarcerated person's legal mail, that individual would be subject to disciplinary action.

31. Processing the legal mail under ODRC's new variance to ODRC Policy No. 75-MAL-03 has permitted a more efficient means of processing and delivery of the incarcerated population's legal mail.

32. Processing the legal mail under ODRC's new variance to ODRC Policy No. 75-MAL-03 is less invasive than the previous processing of legal mail, since a mail clerk does not have to perform a more extensive inspection of the paper and ink. The mail clerk also spends less time physically handling the legal mail under the process directed under the mandate.

33. Processing the legal mail under ODRC's new variance to ODRC Policy No. 75-MAL-03 also allows prison officials and correction officers to not be as concerned about having to

inspect or confiscate legal materials once it is in the possession of the incarcerated population. Because the legal materials are on paper and ink sourced by SOCF and ODRC, there is no need for prison officials and correction officers to believe they contain "soaked" paper.

I, Fred Denney, pursuant to 28 U.S.C. § 1746, make this unsworn declaration under penalty of perjury and declare that the foregoing statements are true.

FURTHER, AFFIANT SAYETH NAUGHT.

6/25/2025

Date

Fred Denney

Sworn to in my presence and subscribed before me this 25th day of June 2025, in the County of Scioto, in

the State of Ohio.

**SHERRI BISHOP**
Notary Public, State of Ohio
Comm. Expires March 19, 2027

NOTARY PUBLIC

My Commission Expires: 3|19|27