UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

OHIO JUSTICE AND POLICY
CENTER,

        Plaintiff,                Case No. 1:25-cv-291

      v.                      JUDGE DOUGLAS R. COLE

ANNETTE CHAMBERS-SMITH, et
al.,

        Defendants.

## OPINION AND ORDER

Plaintiff, the Ohio Justice and Policy Center (OJPC), moves the Court for a preliminary injunction barring Defendants, a handful of Ohio Department of Rehabilitation and Corrections (ODRC) officials, from implementing and enforcing a new legal mail policy for inmates. (Doc. 19). For the reasons discussed below, the Court **DENIES** the motion.

## BACKGROUND

This is a case about legal mail in Ohio state prisons. According to the Second Amended Complaint (Doc. 37), the ODRC, which manages Ohio's prisons, adopted a new policy—the Legal Mail Copying Policy (the Policy)—on December 2, 2024. (*Id.* at #979). The Policy replaced certain provisions of the preexisting legal-mail policy.[1] (*See id.* at #984–87). Under the earlier policy, inmates' legal mail was regulated through

---

[1] ODRC has expanded the Policy since the start of this case. While the Policy first only applied to a few institutions, (Doc. 37, #979), as of September 23, 2025, it applies to all facilities. (*Id.* at #980).

a system of "control numbers," which registered attorneys and courts can generate using a secure website and then affix to envelopes containing legal communications. (*Id.* at #984). The presence of a valid control number on an envelope serves to authenticate the mail as bona fide, addressing the concern that malefactors otherwise could use the guise of confidential attorney-client communications to smuggle contraband into the prison. (*Id.* at #985).

More recently, though, "a synthetic drug commonly referred to as 'toon' has been introduced into ODRC facilities by being sprayed on paper or soaked into paper." (*Id.*). Specifically, letters written on toon-soaked paper are sent to prisoners as a way to smuggle the drug into the facility. (*Id.*). This led the ODRC to adopt the Policy, which added an extra step to the legal mail intake process. (*See id.* at #992; Doc. 37-1 (Policy)). Instead of simply validating the control number and briefly examining the envelope's contents for contraband in the addressee's presence, officials now also handle each page of the mail for "extended period[s] of time." (*Id.* at #987). Specifically, they photocopy each page individually and then provide the photocopied version to the inmate. (*Id.* at #986–88). That way, the prisoner never receives the actual paper from the sender, thereby preventing use of that paper as a means to smuggle drugs into the facility. (*Id.*).

The OJPC takes issue with the extended, page-by-page handling of legal mail by prison staff that the new Policy entails. "Practically speaking," they allege, "it is highly likely that an individual's legal mail will be read by officers during the process of copying the mail because copying the document will naturally require the staff

member to lay eyes on the document." (*Id.* at #989; *see* Shellenberger Decl., Doc. 37-2, #1005–07). That in turn intrudes on the secrecy of privileged attorney-client communications, allegedly violating "the [First Amendment] rights of [the OJPC's] attorneys and clients to have confidential attorney-client communications via the mail." (Doc. 19, #497; Doc. 37, #994 (stating claim under § 1983 for alleged First Amendment violations)). So the OJPC seeks a preliminary injunction prohibiting the implementation of the policy. (Doc. 19).[2] Defendants responded, (Doc. 25), and Plaintiff OJPC replied, (Doc. 29). Additionally, the Cleveland Metropolitan Bar Association (CMBA) filed an amicus curiae brief in support of OJPC's position that the Policy violates confidentiality, but with respect to CMBA's Certified Grievance Committees. (*See generally* Doc. 36). The Defendants have since responded to that brief as well. (Doc. 38). The matter is now ripe.

## LEGAL STANDARD

A party requesting the "extraordinary and drastic remed[y]" of a preliminary injunction "bears the burden of justifying such relief." *ACLU Fund of Mich. v.*

---

[2] The OJPC filed its original Complaint (Doc. 1) and Motion for Preliminary Injunction (Doc. 2) when an earlier version of the Policy was in effect. (*See generally* Doc. 1). That version expired on May 31, 2025, and was superseded by a second iteration, which expanded the policy's scope to more ODRC facilities. (Doc. 37, #979). So the OJPC amended its pleading and its motion to implead additional Defendants (the wardens of the facilities swept into the updated Policy's scope). ODRC amended the Policy for a third time, expanding it to all ODRC institutions. (Doc. 37, #980). The Plaintiff filed a Second Amended Complaint (Doc. 37) encompassing the additional institutions and adding their wardens as Defendants, but did not file a Second Amended Motion for Preliminary Injunction. Because the changes to the policy—adding institutions—does not affect the underlying substance of the Policy, the Court will construe the Amended Motion (Doc. 19) as applying to all ODRC institutions. The Court will likewise construe the Defendant's Response to the Amended Motion (Doc. 25), and the Plaintiff's Reply (Doc. 29), as applying to all ODRC institutions.

*Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (first quoting *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 453 (6th Cir. 2014); and then quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)); *Cretor Constr. Equip. LLC v. Gibson*, 738 F. Supp. 3d 950, 959 (S.D. Ohio 2024). The Court assesses such requests "in light of four well-known factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Cretor*, 738 F. Supp. 3d at 959 (cleaned up). But those factors aren't created equally. *See id.* at 960. In First Amendment cases specifically, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits." *ACLU Fund of Mich.*, 796 F.3d at 642 (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012)). So the first prong is where the Court will focus its efforts.

Before reaching the merits of a plaintiff's request for a preliminary injunction, though, the Court is first obliged to confirm its own subject-matter jurisdiction. *See Crawford v. Law Offs. of Brett Borland*, No. 1:23-cv-191, 2024 WL 187825, at *3 (S.D. Ohio Jan. 12, 2024). A plaintiff's standing to sue is an "irreducible" requirement for such jurisdiction to attach. *Ohio v. Yellen*, 539 F. Supp. 3d 802, 810 (S.D. Ohio 2021). A plaintiff bears the burden of establishing such standing by showing (1) an "injury in fact" that is (a) concrete and particularized, and (b) actual or imminent; that is (2) traceable to Defendants' allegedly unlawful conduct; and that (3) the requested

4

relief would redress. *See id.* (quoting *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017)). As to the first element, one of the standing requirement's core aspects is that "a party must assert his *own* legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Suciu v. Washington*, No. 12-12316, 2012 WL 4839924, at *3 (E.D. Mich. Oct. 11, 2012) (internal quotation marks omitted) (emphasis added).

## LAW AND ANALYSIS

The OJPC argues that the Policy violates two groups' constitutional rights: (1) its own (and by extension, its attorneys'), and (2) its incarcerated clients'. (Doc. 37, #994). The ODRC Defendants in turn argue that OJPC failed to allege concrete and particularized injuries to itself or its attorneys, and thus lacks standing on its own.[3] (Doc. 25, #731–32). And, even if OJPC has standing, the Defendants separately argue that OJPC fails to demonstrate it will be successful on the merits and otherwise fails to support the remaining elements for a preliminary injunction. (*See generally id.*). As explained further below, the Court agrees that OJPC lacks standing based on the alleged harms to its incarcerated clients. And although it has standing based on its own (and its attorneys') rights, the alleged infringement of those rights doesn't merit a preliminary injunction. The Court addresses each topic in turn, starting with the OJPC's own standing.

---

[3] Defendants do not offer much argument regarding standing in their Response. (Doc. 25, #731–32). Instead, they principally rely on their Motion to Dismiss to explain why OJPC lacks standing. (Doc. 24, #708–13). While the court addresses the standing argument from that Motion here, the Court does not rule on the other arguments in the Motion to Dismiss in this Opinion and Order.

**A.      The OJPC Has Standing to Assert Its Own and Its Attorneys' Rights to Communicate, But It Has No Right to Communicate Confidentially.**

The OJPC has standing, but its cognizable injury is more limited than it claims. Specifically, it has a right to communicate with incarcerated persons. But it does not have a cognizable right to communicate with them confidentially.

To support standing, a plaintiff's alleged injury must be concrete and particularized, and it must have already occurred or at least be imminent. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). And plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (citations omitted).

Broadly speaking, OJPC alleges injuries based on violations of its "right to communicate with incarcerated people, the right to freedom of speech and expression, the right to practice their profession absent unreasonable government regulation, and the right to due process of law." (Doc. 37, #994).[4] More specifically, it argues that "OJPC is forced to continue to communicate with its clients via legal mail, placing

---

[4] While OJPC initially states that the Policy violates its right to due process of law, (Doc. 37, #994), it later clarifies that it does not raise a procedural or substantive due process violation. (Doc. 29, #824 n.1). Rather, "[w]hen state officials violate someone's First Amendment rights, they naturally violate the due process clause of the Fourteenth Amendment, because the Clause incorporates the protections of the First Amendment against the states." (*Id.*). So the Court will treat this alleged injury as coextensive with the first injury—an infringement on the First Amendment right to communicate with incarcerated people. *See Kiser v. Kamdar*, 831 F.3d 784, 791 (6th Cir. 2016).

their clients' confidential information in jeopardy, breaking the attorney-client privilege, and placing their attorneys at risk of discipline," under Ohio's Rules of Professional Misconduct 1.18 and 1.6. (*Id.* at #979, 991).

Start with the basic right to communicate with an incarcerated person. While OJPC offers plenty of legal support regarding an *incarcerated person's* rights to receive legal mail, it cites only one case, *Thornburgh v. Abbott*, 490 U.S. 401 (1989), regarding the contours of an *outsider's* right to communicate with inmates. (*See* Doc. 19, #504, 507). As a starting premise, "prison walls do not form a barrier separating prison inmates from the protections of the Constitution, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the inside." *Thornburgh*, 490 U.S. at 407 (citations omitted) (cleaned up). So the court in *Thornburgh* held that there was "no question" that people outside of prison have a First Amendment right to communicate with those in prison. *Id.* at 408; *see also Jones v. Caruso*, 569 F.3d 258, 267 (6th Cir. 2009) (citation omitted) ("The Court has recognized that receiving mail from an outside source, an interest in communication shared by prisoners and their correspondents, is such a First Amendment right."). True, as discussed below, prisoner administrators' regulations of those communications receive deferential review in court. But there is nonetheless a legitimate First Amendment interest at least potentially at stake. And "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)).

Seeking to take advantage of that principle, the OJPC alleges that ODRC's Policy interferes with its ability to communicate with its clients. Its core allegation is that the Policy is an "egregious breach of [its] right[] to *communicate* in a confidential manner with [its] incarcerated clients and incarcerated potential clients, and to vindicate the rights of its incarcerated clients to communicate confidentially with attorneys." (Doc. 37, #975 (emphasis added)). Consistent with *Thornburgh*, if OJPC is asserting an injury based on interference with its right to communicate at all, it would have adequately alleged an injury that supports standing.

But OJPC's challenge appears narrower; it claims that the Policy interferes with its right to communicate with its incarcerated clients *confidentially*. (*Id.*). The problem with that, though, is that, while OJPC has a right to *communicate* with incarcerated persons, that does not include the right to do so confidentially. And thus the Court concludes that OJPC does not have an injury resulting from (and thus any standing to raise) the alleged interference with confidentiality.

OJPC urges a different result, relying heavily on the Sixth Circuit's opinion in *ACLU Fund of Michigan* to support its assertion that an *attorney* has a right to confidential communications with their incarcerated clients. (*See, e.g.*, Doc. 19, #506). But that case recognizes no such right.  While the court there recognized that "both attorneys and inmates have a strong interest" in confidential legal mail, the rest of the opinion focuses on "[a] *prisoner*'s interest in unimpaired, confidential communication with an attorney." *ACLU Fund of Mich.*, 796 F.3d at 643. So that case does not help the OJPC show that it has any rights to communicate confidentially

that the Policy may impact, as would be required for the OJPC to have standing. *See also Dwyer v. Hall*, No. 5:21-cv-12024, 2022 WL 16709712, at *6 (E.D. Mich. Apr. 25, 2022) (explaining that, in *ACLU Fund of Michigan*, "the Sixth Circuit relied only on caselaw applying to the rights of *inmates*. It did not cite any cases concerning the rights of an *attorney*," (emphasis in original)), *report and recommendation adopted*, 2022 WL 5241842 (E.D. Mich. Oct. 6, 2022).

Furthermore, the central issue in *ACLU Fund of Michigan* was that the prison did not deliver certain legal mail from the ACLU to potential incarcerated clients because the prison did not consider the correspondence to be legal mail. 796 F.3d at 640, 642. In other words, the policy at issue there interfered with the ability to receive an attorney's mail *at all*. Here, the OJPC does not argue that the Policy goes that far; rather, the Policy interferes only with the confidentiality of the mail. So *ACLU Fund of Michigan* is inapposite on that front.

Nor can the OJPC point to its status as an attorney to claim a greater right to communicate. In an analogous context, the Sixth Circuit has held that "a jailhouse lawyer's right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts." *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999); *see also Goff v. Nix*, 113 F.3d 887, 890 (8th Cir. 1997) (citations omitted) ("A jailhouse lawyer has no independent right to provide legal advice, but may assert the right on behalf of other inmates who are otherwise unable to obtain access to the courts."). True, the present case does not involve jailhouse lawyers, but the holding still applies. Implications for the attorney's "right to assist," and thus any standing based on that

right, arise only when the prisoner lacks access to the courts. *Thaddeus-X*, 175 F.3d at 395. But OJPC does not allege such a hindrance. *See* infra Law & Analysis, Part B. So the OJPC, as an attorney, cannot point to any unique right to communicate with an incarcerated person as the basis for its standing here; rather it has the same general right to communicate as the publisher in *Thornburgh*, described above.

OJPC argues two other points to complicate this confidentiality analysis: (1) attorney-client privilege, and (2) the Ohio Rules of Professional Conduct. But neither helps its argument. As for attorney-client privilege, OJPC claims the attorney-client privilege grants its own right to confidentiality, and that sending legal mail under this Policy could be viewed as waiving that privilege. (Doc. 28, #770) But, as OJPC itself admits, the "attorney-client privilege belongs to the client." (*Id.* (citing *LifeBio, Inc. v. Eva Garland Consulting, LLC*, 672 F. Supp. 3d 512, 517 (S.D. Ohio 2023)). And as stated in *LifeBio*, "attorney-client privilege—blatant in its name—is a privilege, not a right." 672 F. Supp. 3d at 517–18. So the Policy cannot be violating a right to confidentiality—at least not a right that belongs to OJPC—based on this privilege.

Finally, OJPC argues that sending legal mail under this Policy would cause its attorneys an injury by forcing them to violate their ethical obligations relating to confidentiality under the Ohio Rules of Professional Conduct 1.18 and 1.6. (Doc. 37, #979). Specifically, it alleges that fears of violating the professional rules will chill its speech. (Doc. 28, #764). Even assuming that a violation of these rules would constitute an injury for standing purposes, OJPC has not alleged any imminent

10

threat of enforcement. "Under the First Amendment, mere allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) (cleaned up). And "[i]n order to have standing, therefore, a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent." *Id.* (citation omitted). The OJPC has not alleged any threats of discipline, malpractice lawsuit from a client, or other kind of imminent enforcement due to sending legal mail under this Policy.

True, in the amicus brief, the CMBA seeks to address that issue by pointing to past examples of prisoners filing grievances against their attorneys. (See Doc. 36, #963). But in every one of those examples, the grievance was predicated on the *non-receipt* of attorney correspondence. (*Id.*). But that dovetails more with *Thornburgh*'s discussion of a constitutional right to communicate generally, or *ACLU Fund of Michigan*'s discussion of non-delivery of attorney mail, than with the claimed injury here, which is a right to do so confidentially. So this claim of chilled speech is not sufficient to establish an injury for standing purposes, and it does not help OJPC establish that it has an independent right to communicate confidentially through the mail with its incarcerated clients.

In sum, the OJPC has adequately alleged a general right as an outsider to communicate with those incarcerated. So, it has standing to pursue claims that the Policy interferes with that right. But to the extent it seeks instead to rely on an asserted right to communicate *confidentially* or to assist as an attorney more

11

generally, that is not a right that OJPC has, and so it cannot support standing. *See Thaddeus-X*, 175 F.3d at 395.

Moving to the second prong, traceability, the OJPC claims that the alleged harm flows directly from the Policy's implementation. (Doc. 37, #989–91). And on redressability, it asserts that the Court can cure the alleged rights-violation by preventing the ODRC from enforcing the policy. (*Id.* at #994–95). That suffices to provide it standing for any injury to its right to communicate generally.

For many of the same reasons, the OJPC has standing to assert its attorneys' rights. "'[A]ssociational standing' … permits an entity to sue over injuries suffered by its members." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) (citations omitted). Here, the OJPC's "members" are its attorneys. To have associational standing, an organization must show that: (1) its "members would otherwise have standing to sue in their own right"; (2) the "interests" that the suit "seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The OJPC meets all three requirements here. First, the OJPC describes the above communication injuries "with regard[] to OJPC and its attorneys," which makes sense given that its attorneys are the individuals attempting to communicate with the incarcerated clients. (*See* Doc. 37, #994). In other words, its attorneys would be the specific people injured by any interference with the right to communicate.

Second, the OJPC is a "nonprofit law firm which provides free legal services to people who are incarcerated in Ohio's state prisons," so its pursuit of its attorneys' rights maps directly onto its organizational purpose. (*Id.* at #975). Finally, the presence of each individual attorney isn't necessary in this case, since the OJPC is "not seeking damages on behalf of its members, just the resolution of a pure question of law"— that is, the legality of the Policy. *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 622 (6th Cir. 2004) (cleaned up) (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1996)); (Doc. 37, #994–95 (seeking declaratory and injunctive relief)). So it can press the claims at issue here on their behalf, as well.

In sum, the OJPC has standing to press its, and its attorneys', rights to communicate generally. But it does not itself have, nor do its attorneys have, a cognizable injury based on the inability to do so confidentially.[5]

## B.   The OJPC Doesn't Have Standing to Assert the Rights of its Clients in Their Absence.

But the OJPC doesn't fare so well in its attempt to raise its *clients'* rights— clients who are absent from this litigation (since the OJPC named itself as sole

---

[5] The Court recognizes that an alternate framing may have worked as well. It may be that OJPC has standing (based on its right to communicate generally), but then lacks a viable cause of action, as the wrong to which it points (interference with confidentiality) does not give rise to a valid claim under the asserted right of communication. The exact dividing line between standing and merits is not always clear. *See Trumbull Cnty, Bd. of Comm'rs v. Vill. of Lordstown*, 811 F.3d 226, 227 (6th Cir. 2016) (Mem.) ("Sometimes in no-injury cases the merits and standing issues look the same."). But the Court need not explore that further here because "[w]hether viewed as a matter of standing or merits—a question of some complexity—we end up at the same point." *Jones v. Van Lanen*, 27 F.4th 1280, 1287 (7th Cir. 2022).

Plaintiff). (*Id.* at #971). Although standing generally requires a party to assert only its own rights, one exception—"third party standing"—potentially applies here. A plaintiff "may raise a constitutional claim on behalf of a third party [in addition to his own] if he can prove (1) injury-in-fact to [himself], (2) a close relationship between [himself] and the third party whose rights he asserts, and (3) a hindrance preventing the third party from raising his own claim." *Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017) (citations omitted).

The OJPC's allegations do not suffice to establish its standing to vindicate its clients' rights under the third-party exception. To be fair, they meet the first two prongs. First, the OJPC adequately alleged that Defendants violated its own First Amendment right to communicate with inmates. *See* supra Part A. Second, OJPC and its attorneys have a clear, close relationship with its established clients. As for potential clients, the Sixth Circuit has protected "initial-stage, pre-litigation investigation" correspondence. *ACLU Fund of Mich.*, 796 F.3d at 644–45 (protecting ACLU's letter to non-client inmates about their interest in future litigation). So there is a sufficient relationship for potential clients as well.

But on the third prong, the OJPC failed to show that its "prisoner clients are hindered from advancing their *own* constitutional rights." *Suciu*, 2012 WL 4839924, at *4 (emphasis added). Two other cases—*Kowalski* (in the Supreme Court) and *Suciu* (in another district within this Circuit)—are informative. Those cases held that prisoners weren't hindered from asserting their own claims when the inmates could still pursue their own claims by proceeding pro se even if deprived of an attorney. *See*

14

*id.* at *4 (denying third-party standing because the "claim arising from [the alleged] violation [is] not complex factually or legally"); *Kowalski v. Tesmer*, 543 U.S. 125, 131–32 (2004) (explaining that "an indigent denied appellate counsel has open avenues to argue that denial deprives him of his constitutional rights … [such as] seek[ing] leave to challenge that denial" in a higher court). Stated differently, there was no hindrance in those cases because the inmates could sue on their *own* behalf by proceeding pro se to challenge the alleged rights violations.

As mentioned above, the Sixth Circuit has held that "a 'jailhouse lawyer's' right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts." *Thaddeus-X*, 175 F.3d at 395; *see also Goff*, 113 F.3d at 890 (citations omitted) ("A jailhouse lawyer has no independent right to provide legal advice, but may assert the right on behalf of other inmates who are otherwise unable to obtain access to the courts."). Even though the attorneys here are not jailhouse lawyers, the takeaway is the same: unless the prisoner-client cannot access the courts, the attorney does not have standing to assert the inmate's rights. While the Policy's alleged practical effect is to substantially intrude on the confidentiality of all incoming legal mail, that doesn't prevent inmates from vindicating their own rights or otherwise limit their access to the courts. After all, the Policy doesn't affect *outgoing* mail, so an inmate's filings, pro se or otherwise, wouldn't be hindered—and, therefore, neither would his ability to challenge the Policy—by the Policy's implementation.

Because the OJPC doesn't have standing to invoke its clients' rights on a third-party theory, the Court doesn't have subject-matter jurisdiction to consider the

15

OJPC's claim insofar as it relies on constitutional rights other than the constitutional right that it and its attorneys have to generally communicate with prisoners.

## C.     The OJPC Isn't Likely to Prevail on the Merits of the Claim it has Standing to Advance.

So that leads to the relief requested in the motion at issue today—a preliminary injunction. As a reminder, in First Amendment cases specifically, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits." *ACLU Fund of Mich.*, 796 F.3d at 642 (quoting *Bays*, 668 F.3d at 819 ). Here, as described above, the OJPC has standing to attack the regulations only to the extent that it has a right to communicate with inmates in general under *Thornburgh*. And the Supreme Court has found that the regulations limiting such communications need only be "reasonably related to legitimate penological interests." *Thornburgh*, 490 U.S. at 413 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).[6]

As the citation suggests, the reasonably-related inquiry is governed by the four-factor analysis the Supreme Court laid out in *Turner*. First, courts consider "whether a valid rational connection exists between the prison regulation and the legitimate governmental interest put forward to justify it." *Human Rights Def. Ctr. v. Baxter Cnty., Ark.*, 667 F. Supp. 3d 959, 967 (W.D. Ark. 2023) (internal quotation

---

[6] Courts do apply a "heightened concern" to alleged violations of a *prisoner's* right to receive legal mail, since the more specific—and stronger—constitutional guarantees of access to the courts and counsel belong to the inmate-recipient. *See Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003). But this "heightened concern" does not necessarily apply to the attorney-sender. The caselaw confirms that while the subject matter of the right—legal mail—is the same, its bite differs based on the status of the person invoking it. *Cf. Dwyer*, 2022 WL 16709712, at *6.

16

marks omitted). If that first factor is not met, "the policy is unconstitutional, and the other factors do not matter." *ACLU Fund of Mich.*, 796 F.3d at 646 (quoting *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994)). But if the challenged policy passes that threshold test, courts balance three remaining factors: (1) "whether there are alternative means of exercising the right that remain open to prison inmates," (2) the "impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (3) "whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Id.* (cleaned up). At the preliminary-injunction stage, the burden is on the OJPC to show that those factors are likely to weigh in its favor. *See Jones v. Caruso*, 569 F.3d 258, 279 (6th Cir. 2009) (McKeague, J., dissenting).

The OJPC hasn't shown that it is likely to prevail on any of the four *Turner* factors. On the initial factor, the "legitimacy of the [ODRC's] purpose in promulgating [the Policy] is beyond question"; the policy is "expressly aimed at protecting prison security, a purpose [the Supreme Court] has said is 'central to all other corrections goals.'" *Thornburgh*, 490 U.S. at 415 (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)). And the Policy strikes the Court as rationally related to that legitimate interest—indeed, the OJPC recognizes in its motion that the "ODRC may be justified in limiting paper … to prevent the importation of synthetic drugs" into prison facilities. (Doc. 19, #511). To be fair, the OJPC only concedes that justification's force "in other contexts"—i.e., in contexts other than legal mail—since "attorneys are not

17

the culprit" for the importation of drug-saturated paper. (*Id.*). But their own evidence suggests otherwise. The ODRC's contraband incident report, (Doc. 19-9), which the OJPC attached to its motion, shows that contraband continued to pop up in legal mail even after the institution of the control-number system, (*see id.* at #582 (records for July 2021 onward); *see also* Doc. 37, #985–86 (explaining how contraband in legal mail continues to the present)). True, those numbers have dropped "precipitously" over the past few years. (Doc. 37, #986). But they persist. And a drop in frequency doesn't show that the Policy's "goal is so remote as to render [it] arbitrary or irrational," *Turner*, 482 U.S. at 89–90, especially since the Policy responds *specifically* to the problem of drugs "sprayed on paper or soaked into paper," (Doc. 37, #985). So on the record before the Court, the OJPC hasn't established a likelihood that the Policy is anything but an "innovative solution[] to the intractable problems of prison administration." *Turner*, 482 U.S. at 89.

Since the OJPC hasn't shown a likelihood that the Policy fails on *Turner*'s threshold rationality inquiry, the remaining three balancing factors kick into play. At the outset, the Court notes that two of those factors fit poorly onto claims invoking only the rights of an outside communicator (that is, a non-prisoner whose communications with inmates are subject to the challenged regulation).[7] Namely,

---

[7] *Thornburgh*, where the Supreme Court explained that the *Turner* test applied to regulations of outside speakers' ability to communicate with inmates, was itself a case brought by "a class of inmates *and* certain publishers." *Thornburgh*, 490 U.S. at 403 (emphasis added). So the *Thornburgh* Court's analysis of the *Turner* factors, though aimed at evaluating the challenged regulations in light of "publishers['] … legitimate First Amendment interest in access to prisoners," still took account of the "inmates' First Amendment Rights." *Id.* at 415. As explained above, *see supra* Part B, the inmates' rights aren't properly before the Court at

"whether there are alternative means of exercising the right that remain open to *prison inmates*," and "whether there are ready alternatives available that fully accommodate the *prisoner's rights* at de minimis cost to valid penological interests," are both inquiries that center on the *prisoner*'s rights. *See ACLU Fund of Mich.*, 796 F.3d at 646 (emphases added); *see also Dwyer*, 2022 WL 16709712, at \*6 (distinguishing between claims of prisoners' rights and claims of attorney's rights). So it's unclear how, or even if, the Court is to apply those factors when, as explained above, the OJPC's clients' rights aren't properly before the Court in this case's current posture. *See* supra Part B.

But even assuming—without deciding—that those inquiries somehow come out in the OJPC's favor, the remaining factor doesn't. Namely, it isn't clear that enjoining the Policy will positively (or even neutrally) "impact … guards and other inmates" or "the allocation of prison resources generally." *ACLU Fund of Mich.*, 796 F.3d at 646. On the one hand, the OJPC is correct that enjoining the Policy would have the practical effect of freeing prison staff from "hav[ing] to spend time copying legal mail and ensuring that the photocopy matches the original." (Doc. 19, #513). But that doesn't mean there would necessarily be "very little 'tradeoff' … between the rights asserted by Plaintiff and the legitimate security interests of ODRC." (*Id.*). As the ODRC Defendants argue, the Policy "allows corrections officers and prison officials to spend more time addressing prison safety and security issues and less time

---

this stage, so *Thornburgh*'s application of the *Turner* factors provides little guidance at this point.

addressing the delivery of mail and the search for contraband." (Doc. 25, #737). So it's possible that the problem of drug-soaked paper is so prevalent that the costs of the Policy are well worth it. At a minimum, the OJPC hasn't sufficiently demonstrated that's *not* the case to satisfy the likelihood of success on the merits element necessary to win a preliminary injunction.

At bottom, "prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations." *Turner*, 482 U.S. at 89 (cleaned up). Sometimes, those judgments are unlawful. This Policy might be one of those. If it is, the OJPC can continue to seek relief before this Court. But at this very early juncture, it hasn't made the necessary showing of "a strong or substantial likelihood or probability of success on the merits" necessary to entitle it to this Court's intervention before Defendants have had their day in court. *Ray v. Fifth Third Bank, N.A.*, 689 F. Supp. 3d 502, 509 (S.D. Ohio 2022) (citations omitted).

*     *     *

Before concluding the Court takes a moment to stress just how narrow the decision here is. As just noted, the Court has made no final determination on whether the Policy is constitutional, even under the *Thornburgh* framework for general communications. But more importantly, because the Court concludes that OJPC lacks standing based on an alleged injury to its clients' rights, the Court expresses no opinion on whether the prisoners *themselves* may have a viable claim to challenge the Policy on attorney-client privilege or other confidentiality grounds. That, however, is a question for another day in a case involving different plaintiffs.

20

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiff's Amended Motion for Preliminary Injunction (Doc. 19).[8]

    **SO ORDERED.**

February 10, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[8] Plaintiff's original Motion for Preliminary Injunction (Doc. 2) is denied as moot as Plaintiff OJPC filed the Amended Motion, (Doc. 19).

21